IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GENERAL REFRACTORIES COMPANY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FIRST STATE INSURANCE CO., et al. | : | No. 04-3509 |

**MEMORANDUM**

Ludwig, J.                                                                                                February 21, 2012

The parties cross-move for partial summary judgment.[1]  Fed. R. Civ. P. 56.  See fn. 1 for case history.

---

[1] On July 23, 2004, plaintiff General Refractories Company filed this diversity action against 16 of its umbrella and excess insurance carriers, suing for a declaration of insurance coverage against asbestos-related claims and for breach of insurance contracts.  Defendants maintain that the policies sold to plaintiff GRC contain exclusions of asbestos-related bodily injury claims and denied coverage.

On June 3, 2005, five of the insurance carriers originally named as defendants moved to dismiss the action under Fed. R. Civ. P. 12(b)(7) for failure to join indispensable parties under Fed. R. Civ. P. 19 (doc. no. 149).  Those defendants contended that the complaint had not named all of the excess and umbrella carriers that had provided GRC with insurance coverage during 1979 to 1986, and that the absent carriers were indispensable to the action.  Some of the absent carriers were non-diverse.  On September 27, 2005, the court dismissed the action, ruling that the absent insurers were necessary and indispensable parties under Rule 19.  Gen. Refractories Co. v. First State Ins. Co., 234 F.R.D. 99, 100 (E.D. Pa. 2005).  On October 27, 2005, reconsideration of that ruling was denied.  (Orders and mem., doc. nos. 158, 159, 166.)  Defendants appealed these two orders.  On August 28, 2007, our Court of Appeals reversed the September 27, 2005 order that dismissed the action for lack of necessary parties and remanded this action.  Gen. Refractories Co. v. First State Ins. Co., 500 F.3d 306 (3d Cir. 2007).

On November 15, 2007, discovery commenced.  (Order, Nov. 13, 2007, doc. no. 191).  After remand, on June 7, 2010, nearly six years after this litigation had been commenced, fact discovery closed.  (Orders, Jan. 21, 2010 and Feb. 19, 2008, doc. nos. 239, 199.)  On April 29, 2011, expert discovery was closed.  (Order, Mar. 17, 2011, doc. no. 303).

On April 29, 2011, GRC moved for partial summary judgment as to all defendant insurance carriers (doc. nos. 311, 312 (sealed)).  On June 28, 2011, one group of defendants – Hartford Accident and Indemnity Company and First State Insurance Company moved for partial summary judgment (doc. nos. 321, 323 (sealed)), and another group – "Certain Defendants" – moved separately for partial summary judgment (doc. no. 324 (sealed)).  On that date, defendants Lexington Insurance Company and AIU Insurance Company joined in Hartford A&I's and First States' motion (doc. nos. 322, 366).  On August 12, 2011, defendants jointly moved to strike the affidavit of Michael R. Powers, Ph.D. (doc. no. 354), which GRC submitted in support of its motion (doc. nos. 334, 334-1).  By September 16, 2011, all briefs were submitted.

1

Plaintiff General Refractories Company (GRC), a manufacturer and supplier of asbestos-containing products, sues all of its insurance carriers for a declaration of excess liability insurance coverage for underlying asbestos-related claims.[2] GRC is a defendant in numerous asbestos-related suits throughout the United States. The insurance policies were issued between 1979 and 1985.

GRC moves for partial summary judgment (doc. nos. 311, 312 (sealed)), asserting that the exclusions were not submitted to and formally approved by the Insurance Commissioner as required by Pennsylvania's insurance laws – in particular 40 P.S. § 477b. Compl. ¶¶ 51, 50-58. Section 477b directs the Commissioner to approve or disapprove the form of insurance contracts before they are issued and sold. GRC maintains that the exclusions are "invalid and unenforceable" because they violate public policies expressed in or underlying those laws. Id. at ¶¶ 51, 52, 58. GRC: "Prior to November 9, 1987, whenever an insurance company or its representatives submitted for approval any asbestos-related exclusion . . . , it was the general policy of the Pennsylvania Insurance Department to disapprove such exclusion," id. at ¶ 53; the "policies were sold several years before the . . . Department approved any asbestos-related exclusion for use in comprehensive general liability policies," id. at ¶ 54; and the exclusions would not have been approved if submitted, id. ¶ 58. GRC

---

[2] In particular, GRC sues for a declaration "that any asbestos-related exclusions in the Policies are invalid and unenforceable" and that defendants are required "to pay for GRC's defense of the Underlying Actions, and to reimburse GRC for, or pay on behalf of GRC, any and all judgments or settlements reached in the Underlying Actions, until such time as the total aggregate limits of each of the foregoing insurance policies have been exhausted." (Compl., doc. no. 1 at 10.) GRC also sues for breach of contract, claiming that defendants "refused to honor their obligations to provide GRC with a defense or indemnification in and for the Underlying Actions." (Id., ¶ 73, at 11.)

asserts that defendants did not submit their forms of exclusion because the Department had an established practice of rejecting asbestos exclusions. Def. br. at 2 (doc. no. 312).

According to defendants, the exclusions do not violate public policy and are enforceable as a matter of law. For example, defendants Hartford Accident and Indemnity Company and First State Insurance Company cross-move for partial summary judgment (doc. nos. 321, 323 (sealed)), asserting that § 477b does not apply to their policies and that GRC's complaint asserts a private cause of action not recognized under that statute. First State posits, as a "surplus lines"[3] carrier not licensed to do business in Pennsylvania, that it was not "doing business" in the Commonwealth under § 477b and, therefore, was not required to obtain the Commissioner's approval. In addition, five of the six policies issued by First State and both policies issued by Hartford "followed form"[4] to an underlying umbrella policy. These defendants maintain that their policies did not require the Commissioner's approval: "It is the underlying insurer – not the following-form excess insurer – that issues, sells, or disposes of the policy language contained in the underlying policy. And, therefore, it is the

---

[3] At the time defendants issued their policies, the Unlicensed Insurers Act of 1966, Jan. 24, P.L. (1965) 1509, §§ 1006.1-1006.19, as amended, regulated surplus lines insurance business in Pennsylvania. "Surplus lines activity" is "any business activity incident to the placement of insurance with an unlicensed insurer, excepting, however, the performance of routine accounting or clerical tasks." Id., § 1006.2(4). The Act was repealed in 1992 and replaced by Article XVI of The Insurance Company Act of 1921, May 17, P.L. 682, as amended, 40 P.S. §§ 991.1601-991.1626.

[4] See Kropa v. Gateway Ford, 974 A.2d 502, 505 n.3 (Pa. Super. Ct. 2009) (citing Lexington Ins. Co. v. W. Pa. Hosp., 318 F. Supp.2d 270, 274 n.3 (W.D. Pa. 2004) ("It is well settled that the obligations of following form excess insurers are defined by the language of the underlying policies, except to the extent that there is a conflict between the two policies, in which case the wording of the excess policy will control."), aff'd, 423 F.3d 318 (3d Cir. 2005)), appeal denied, 990 A.2d 730 (Pa. 2010).

underlying insurer that is required to submit the policy language to the DOI for approval." Defs. br. at 10 (doc. no. 323).

Lexington Insurance Company and AIU Insurance Company join in Hartford's and First State's motion (doc. nos. 322, 366). From 1979 to 1985, Lexington issued three and AIU issued two follow-form excess policies to GRC. Conkin Aff. ¶¶ 5-9, Ex. 1 (doc. nos. 322, 322-1, 322-3). Lexington was a surplus lines insurer. Id. (doc. nos. 322 at 1, 322-2). The motion is now moot as to two policies issued for the period August 1, 1984-85: Lexington policy no. 552 6337 and AIU policy 75-103894.[5] Orders and mem., June 20, 2011 and Jan. 27, 2012 (doc. nos. 318-320, 406-407).

For similar reasons, "Certain Defendants"[6] also cross-move for partial summary

---

[5] During discovery, Lexington and AIU contended that their policies contained exclusions for asbestos products liability. On October 22 and November 2, 2010, GRC moved for partial summary judgment as to each of these defendants (doc. nos. 277 and 278, respectively), because their policies did not contain such an exclusion. On November 22, 2010, defendants moved to amend their answer to plead counterclaims for reformation and rescission of their policies (doc. no. 284), which motion was granted. (Order, Mar. 24, 2011, doc. no. 304; Counterclaims, doc. no. 284 at 29-37.) GRC's motions for summary judgment were then granted. (Orders and mem., June 20, 2011, doc. nos. 318-320.)

On June 8, 2011, before the Court had ruled on the summary judgment motions, GRC again moved for partial summary judgment (doc. no. 315) requesting dismissal of the amended counterclaims. Defendants were granted limited discovery plus two enlargements of the response deadline and were directed to respond to the motion for summary judgment by September 9, 2011. (Order, July 11, 2011, doc. no. 328; Order, Aug. 3, 2011, doc. no. 352.) On that date, defendants cross-moved for partial summary judgment, contending the policies should be reformed to exclude asbestos-related claims or should be rescinded (doc. no. 360). On January 27, 2012, reformation or rescission of the policies was denied, and plaintiff's motion for partial summary judgment was granted, the counterclaims were dismissed, and defendants' cross-motion was denied. (Order and mem., Jan. 27, 2012, doc. nos. 406-407.)

[6] The term "Certain Defendants" includes: Government Employees Insurance Company; Republic Insurance Company; Westchester Fire Insurance Company; AIU Insurance Company; Continental Insurance Company as successor-in-interest to certain policies of insurance issued by Harbor Insurance Company; Lexington Insurance Company; Sentry Insurance A Mutual Company, as assumptive reinsurer of Great Southwest Fire Insurance Company, sued herein as Vanliner Insurance Company; Travelers Casualty and

judgment (doc. nos. 324 (sealed)).  These defendants say that the exclusions are enforceable as a matter of law.  Moreover, because § 477b does not create a private cause of action, the enumerated statutory remedies do not include the voiding of policy provisions, and Pennsylvania's General Assembly did not enact any statute prohibiting asbestos-related exclusions.[7]

None of the exclusions or exclusionary endorsements was approved by the Insurance Commissioner pursuant to Pennsylvania's regulatory insurance statute:

> It shall be unlawful for any insurance company . . . , doing business in this Commonwealth, to issue, sell, or dispose of any policy . . . , covering . . . all forms of casualty insurance, . . . or use applications, riders, or endorsements, in connection therewith, until the forms of the same have been submitted to and formally approved by the Insurance Commissioner, and copies filed in the Insurance Department, . . . except any forms, which, in the opinion of the Insurance Commissioner, do not require his approval.

Section 534 of The Insurance Company Law of 1921, May 17, P.L. 682, as amended, 40 P.S. § 477b.  Defendants concede as much, but contend nevertheless that the exclusions are enforceable.

That issue – whether enforcement of the exclusions would violate important public

---

Surety Company (formerly known as The Aetna Casualty and Surety Company and incorrectly designated in the Complaint as "St. Paul Travelers"); and Westport Insurance Corporation, formerly known as Puritan Insurance Company.  Defs. br. (doc. no. 324 at 1 n.1).

[7] Defendants also say that § 477b does not apply to a "manuscript" policy – one that is specially designed for a particular insured.  See, e.g., Port. Auth. of N.Y. & N.J., 311 F.3d 226, 231, 235 (3d Cir. 2002) (insureds drafted the policies with the aid of counsel and insurance professionals and negotiated in some respects with the underwriters).  The record does not establish that defendants' policies were such forms.  The parties' negotiations and agreements in regard to the policies present issues of fact for trial.  See, e.g., DiFebbo Aff. ¶¶ 2-8, Exs. 1-7 (doc. no. 325); Conf. Weinberg Aff. ¶¶ 3-4, Exs. A, B (doc. no. 323); Weinberg Aff. ¶¶ 5-7, Exs. 3-5 (doc. no. 323).

policies expressed in or underlying § 477b when the policies were sold to GRC in 1979 to 1985 – is presented in the pending cross-motions for partial summary judgment. Today's order holds that there are genuine issues of material fact as to the public policies proposed by GRC and, therefore, none of the moving parties is entitled to judgment as a matter of law.

Discovery has been completed, and the following is not in dispute: 1. The wording of the exclusions that defendants used does not contravene any statute or regulation. 2. For purposes of these motions, GRC does not contend that the exclusionary language is ambiguous or otherwise objectionable except to the extent that asbestos-related hazards are excluded. 3. The record does not contain any evidence that the exclusions were submitted to the Insurance Commissioner or that the Commissioner approved the exclusions. 4. Defendants' use of the exclusions was an express violation of § 477b. 5. Pennsylvania's General Assembly has not enacted any statutes prohibiting asbestos-related exclusions such as the ones set forth in defendants' policies. 6. The Insurance Commissioner has not published any official pronouncements or promulgated any regulations that expressly prohibit such asbestos-related exclusions.

"'Generally, courts must give plain meaning to a clear and unambiguous contract provision unless to do so would be contrary to a clearly expressed public policy.'" Heller v. Pa. League of Cities & Mun., 32 A.3d 1213, 1220 (Pa. 2011) (quoting Prudential Prop. & Cas. Ins. Co. v. Colbert, 813 A.2d 747, 750 (Pa. 2002)). GRC challenges the exclusions solely on the ground that they violate public policies expressed in or underlying § 477b.

GRC has the burden to prove that the public policy considerations invalidate the exclusions. Williams v. GEICO Gov't Emp. Ins. Co., 32 A.3d 1195, 1200 (Pa. 2011) ("a high burden"); Heller, 32 A.3d at 1229 ("a heavy burden") (Saylor, J., dissenting).

The Supreme Court of Pennsylvania recently reaffirmed its "reticence to throw aside clear contractual language based on 'the often formless face of public policy,'" Heller, 32 A.3d at 1220 (quoting Colbert, 813 A.2d at 752 (a "cautious approach")), explaining:

> "Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. . . . Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts . . . contrary to public policy. The courts must be content to await legislative action."

Id. at 1220-21 (quoting Burstein v. Prudential Prop. & Cas. Ins. Co., 809 A.2d 204, 207 (Pa. 2002) (quoting Eichelman v. Nationwide Ins. Co., 711 A.2d 1006, 1008 (Pa. 1998)); Williams, 32 A.3d at 1199-1200 ("When examining whether a contract violates public policy, this Court is mindful that public policy is more than a vague goal which may be used to circumvent the plain meaning of the contract."). Further:

> "It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of a community in so declaring [that the contract is against public policy]."

Heller, 32 A.3d at 1221 (quoting Mamlin v. Genoe, 17 A.2d 407, 409 (Pa. 1941)). "The application of public policy concerns in determining the validity of an insurance exclusion

is dependent upon the factual circumstances presented in each case." Id. at 1223 (citing Paylor v. Hartford Ins. Co., 640 A.2d 1234, 1240 (Pa. 1994)).

A party moving for summary judgment must proffer specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A).

The parties strenuously dispute whether during 1979-85 a dominant public policy against the use of unapproved asbestos-related exclusions existed that warrants judicial invalidation of the exclusions here. Defendants deny the existence of any such policy. GRC submits that the Insurance Department had an "across-the-board policy of rejecting any attempt by an insurance company to exclude asbestos-related claims from coverage sold to Pennsylvania policyholders," because the Department had "determined that the exclusion of asbestos-related claims was against public policy." Def. br. at 2 (doc. no. 312). GRC: "Defendants were faced with the choice of either submitting the exclusions and having them rejected, or ignoring the statutory mandate by not submitting them at all, and just using them." Id. GRC's materials offer some circumstantial evidence that some Insurance Department representatives considered use of unapproved policy terms to be unlawful and against public policy; also some Departmental examiners rejected particular asbestos-related exclusions as against public policy. But for the most part, those matters do not directly evidence that during 1979-85, the Department uniformly rejected all asbestos-related exclusions according to a policy set by the Insurance Commissioner.[8]

---

[8] GRC submits *amici curiae* briefs filed by the Insurance Department and the insurance industry in Am. Ass'n of Meat Processors v. Cas. Reciprocal Exch., 588 A.2d 491 (Pa. 1991). (Conley Aff. ¶¶ 3, 4,

Circumstantial proof of the Insurance Department's activities alone would not satisfy the standard of a "dominant" public policy. To do so, the proponent must demonstrate "a plain indication of that policy through long governmental practice or statutory enactments, or of obvious ethical or moral standards." Heller, 32 A.3d 1220-21; see also INA Ins. Co. v. Ins. Dept., 376 A.2d 670, 672-73 (Pa. Commw. Ct. 1977) ("There is no authority for the proposition that the Commissioner is bound in his adjudications by the decisions and

---

Exs. A, B (doc. nos. 311-3, 311-4)). These materials provide some evidence of the Department's views in 1991 concerning the use of unapproved policy terms, including: "Perhaps most disturbing of all is that such an agreement escapes review entirely. . . . such circumvention of the statutory process renders the Insurance Commissioner's duty at law virtually impossible to implement." Id. (doc. no. 311-3 at 15). However, Meat Processors involved public policies reflected in Pennsylvania's statutory workers compensation scheme and did not specifically consider § 477b. (See also Conley Aff. § 13, Ex. K, Pa. Attorney General's Apr. 26, 1974 Opinion No. 22 (doc. nos. 331-3, 311-7 at 20) ("But, insurance policies containing such terms, even though unenforceable, are likely to cause policyholders to forego meritorious claims in the mistaken belief that the terms are, in fact, enforceable.")).

GRC offers correspondence between the Insurance Department and some party and non-party insurers that culminated in the rejection of their proposed asbestos-related exclusions. (Conley Aff. ¶¶ , Exs. C, D, I, J (doc. nos. 311-3, 311-4, 311-7); Conley Aff. ¶¶ 3, 4, Exs. A, B (doc. no. 312 (sealed)). However, these materials were generated after defendants had sold the policies at issue here to GRC.

GRC submits the May 20, 2010 deposition testimony of David F. Wulf, who was employed by the Insurance Department from 1972 to 2003, serving as Supervisor of Rate and Policy Regulation during part of his tenure there. Wulf testified that he followed the Department's internal guidelines in his review of policy terms. (Conley Aff. ¶ 8, Wulf Dep., Ex. F (doc. nos. 311-3, 311-5, 311-6)). Wulf testified that prior to 1987, the Department disapproved asbestos-related exclusions "across the board." (Id., Wulf Dep. at 21, 61, 100-109.) GRC also submits Wulf's April 17, 1996 sworn statement that: "To the best of my knowledge and recollection, prior to November 9, 1987, it was the policy of the Pennsylvania Insurance Department to generally disapprove asbestos exclusions in Commercial General Liability . . . policies." (Conley Aff. ¶ 9, Ex. G (doc. nos. 311-3, 311-7)).

Hartford and First State respond that "[o]n June 8, 1986, . . . the DOI approved an asbestos exclusion that would be included in an umbrella policy issued by several Hartford writing companies admitted to do business in Pennsylvania . . . ." (Defs. br. at 19; Conf. Weinberg Aff., Ex. D (June 18, 1986 letter from Lyke to Grode and stamp approving the exclusion effective August 1, 1986), Ex. E (Nov. 28, 1996 letter from Wulf to Lyke: "The Department cannot reconsider your Asbestos Exclusion Endorsement unless a minimum 5% credit be granted to the policy premium."), doc. no. 323.)

reasoning of a subordinate."). On this record, an undisputed policy or practice implemented by the Insurance Commissioner has not been established.

Pennsylvania may regulate the business of insurance, because "it is a business affected with a public concern." Golden Rule Ins. Co. v. Ins. Dep't, 641 A.2d 1255, 1260 (Pa. Commw. Ct. 1994) (citing Long v. Sakleson, 195 A. 416, 421 (Pa. 1937) ("It has long been held that a state has the right to regulate the business of insurance. It is a business affected with vital public concern, and the state has full power to protect its citizens from the conduct of business by those engaging in it irresponsibly or fraudulently.")). Whereas the Insurance Department "is charged with the execution of the laws of this Commonwealth in relation to insurance," the enforcement and regulatory functions of the Department are delegated by the General Assembly to the Insurance Commissioner. Sections 201 and 202 of The Insurance Department Act of 1921, P.L. 789, 40 P.S. §§ 41, 42 ("Governor, with the advice and consent of the Senate, shall appoint an Insurance Commissioner"). The Pennsylvania Supreme Court explains:

> "The General Assembly, in recognition of the specialized complexities involved in insurance generally, and in the regulation of this industry in particular, assigned the task of overseeing the management of that industry, in this Commonwealth, to the Insurance Department, the agency having expertise in that field. . . . The Insurance Commissioner, an appointed position . . . is, therefore, afforded broad supervisory powers to regulate insurance business in this Commonwealth, including the power to protect 'the interest of insureds, creditors, and the public generally . . . .'"

Aetna Cas. & Sur. Co. v. Ins. Dept., 638 A.2d 194, 200 (Pa. 1994) (quoting Foster v. Mut. Fire, Marine & Inland Ins. Co., 614 A.2d 1086, 1091 (Pa. 1991), cert. denied, 506 U.S. 1080 (1993) and 40 P.S. § 221.1(c)).

GRC has met the burden to show a genuine dispute for trial as to the existence of a public policy set by the Insurance Commissioner. GRC attaches the affidavit of Michael R. Powers, Ph.D., who from 1987 to 1990 was one of three Deputy Insurance Commissioners with administrative responsibility for the Office of Rate and Policy Regulation. Powers' affidavit affirms that "[d]eterminations of whether or not the Department would disapprove specific policy forms based upon public-policy considerations were made by the Insurance Commissioner." And the "Department's practice was to disseminate the . . . Commissioner's public-policy determinations through internal policy statements and guidelines so that the Department's policy would be implemented consistently." Conley Aff. ¶ 3, Ex. 1, Powers Aff. ¶¶ 5, 6 (doc. nos. 334, 334-1). Powers' affidavit states that in 1987 he was involved in the Department's reevaluation of its position concerning the use of asbestos-related exclusions; and "it is my understanding that during the time period at issue in this litigation (1978 to 1985), the Department's policy was to disapprove asbestos-related exclusions." Id., Powers Aff. ¶ 10.

Powers' affidavit incorporates two letters written by Insurance Department examiners in 1985 as examples of the Department's policy to reject asbestos-related exclusions as against public policy. Id., Powers Aff. ¶ 7, Ex. A (Blackmore's Oct. 28, 1985 letter), Ex. B (McAvoy's Nov. 25, 1985 letter). In one letter, the Department disapproved use of an asbestos-related exclusion because:

1. The Asbestos Exclusion is unreasonable. This has been an inherent risk for years.

11

    2.       There is inadequate consideration for the reason there is no credit given for attaching such an exclusion to the policy.

    3.       The exclusion is contrary to public policy. There is no alternative for the insured and there is no other available market.

Id., Ex. A, quoting letter. The other letter also disapproved use of an asbestos-related exclusion because:

    1.       The exclusion places an unreasonable restriction on policy coverage due to the presence of this inherent hazard for the last two decades or more. . . .

    2.       The Department feels that the inclusion of such an endorsement on general liability policies is contrary to public policy due to the lack of another available market place for this exposure.

Id., Ex. B, quoting letter. This evidence suggests that during 1978-85, the Commissioner implemented a policy, uniformly executed by the Department, to disapprove all asbestos-related exclusions.

Defendants jointly move to strike Powers' affidavit (doc. no. 354) because Powers had no personal knowledge of the Department's policies and practices before he became employed there in 1987. They object that Powers' testimony is inadmissible hearsay. However, that objection affects the weight of Powers' testimony and not its admissibility. See Fed. R. Evid. 602.[9] Powers testified that he was personally involved in the Department's reevaluation of its position concerning the use of asbestos-related exclusions. He is competent to testify to his own personal knowledge of that process as well as records,

---

[9] "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602.

practices, and procedures of the Department during his tenure, including his own beliefs and conclusions.

Moreover, defendants' objections are premature. The Federal Rules of Evidence prohibit the admission of hearsay evidence – statements made out of court that are offered to prove the truth of the matter asserted. Fed. R. Evid 801, 802. But Powers did not mention any out of court statements by third parties. While a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), there is no reason to assume that Powers' testimony could not be presented in an admissible form at trial. See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1235 n.9 (3d Cir. 1993) (citing J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990) ("hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony")).

GRC's position is based in part on the express violation of § 477b, which itself is some evidence of Pennsylvania' public policies: "'[A]n enactment by the legislature . . . is indeed the embodiment of public policy.'" Heller, 32 A.3d at 1227 (quoting Erie Ins. Exch. v. Baker, 972 A.2d 507, 511 n.7 (Pa. 2008)). However, GRC must prove more than a technical regulatory violation to warrant invalidation of the exclusions:

> "The overriding concern powering the decisions in *Burstein*, *Eichelman*, and the earlier cases is to ensure that both insurer and insured receive the benefit of what is statutorily required and contractually agreed-upon (consistently with statutory requirements) and nothing more. . . . [A]n insured should not be

permitted to demand coverage for a risk for which coverage was not elected or premiums paid."

Williams, 32 A.3d at 1200 (quoting Colbert, 813 A.2d at 759) (Castille, J., concurring and dissenting)).[10] There is no decision by a federal or state court in Pennsylvania refusing to enforce an asbestos-related exclusion because the terms had not been approved pursuant to § 477b. Of the scant number of decisions that have directly ruled on § 477b, none has refused to enforce policy terms solely because the terms were not approved by the Insurance Commissioner. Decisions that have refused to enforce unapproved policy terms have done so only where the terms were found to violate important, long-recognized public policies reflected in other complex statutory schemes that are not presented here.

Defendants contend that GRC impermissibly sues for private enforcement of § 477b so as to fashion a remedy not statutorily enumerated – invalidation of the exclusions. Defendants say that Pennsylvania does not recognize a private cause of action for violation of § 477b. They cite two unreported decisions that conclude as much, but which are bare holdings without explanation: AstenJohnson, Inc. v. Columbia Cas. Co., No. 03-1552, doc. no. 210 (Feb. 2, 2006 order deciding a motion in limine) (Stengel, J.); Magner v. Assoc. Ins. Cos., Inc., No. 93-1932, 1995 WL 29045, *7 (E.D. Pa. Jan. 26, 1995) (Hutton, J.). Those

---

[10] Pennsylvania cases: Sheppard v. Old Republic Life Ins. Co., 346 A.2d 383 (Pa. Commw. Ct. 1975); Rogers v. Penn Mut. Life Ins. Co. of Philadelphia, 26 A.2d 127 (Pa. Super. Ct. 1942); Hepler v. Liberty Mut. Fire Ins. Co., 13 Pa. D. & C.4th 528 (Com. Pleas Ct. 1992); Butler v. Bankers Mut. Fire Ins. Co., 76 Pa. D. & C. 352 (Com. Pleas Ct. 1951).
  Federal cases: Reliance Ins. Co. v. Moessner, 121 F.3d 895, 897 (3d Cir. 1997); Herman v. Mut. Life Ins. Co. of N.Y., 108 F.2d 678, 682 (3d Cir. 1939); Cinkutis v. Confederation Life Ins. Co., No. 89-8354, 1990 WL 161260 (E.D. Pa. Oct. 19, 1990).

decisions implicitly indicate that neither the plain terms of § 477b nor any other provision of Pennsylvania's insurance laws expressly authorizes a private cause of action for lack of the Commissioner's prior approval of policy terms.

The phrase "cause of action" "does not have a single definition, and means different things depending on context." Ieropoli v. AC&S Corp., 842 A.2d 919, 929 & n.17 (Pa. 2004). Here, GRC's complaint states a "cause of action" that relates to a remedy. See id. at 929-30 (a cause of action "is the vehicle by which a person secures redress from another person for the consequences of an event that is a legal injury"). GRC's proposed remedy is that the exclusions should not be enforced.

Unenforceability has been the basis for a common law remedy long-recognized by the Pennsylvania Supreme Court. See, e.g., Heller, 32 A.3d at 1221 (where the exclusion did not expressly contradict any statutory language at issue, the court considered dominant public policies to invalidate the exclusion). In Am. Ass'n of Meat Processors v. Cas. Reciprocal Exch., the Pennsylvania Supreme Court refused to enforce unapproved rebate terms of an oral insuring agreement that resulted in a lower premium, by applying

> "the general rule that an agreement which violates a provision of a statute, or which cannot be performed without violation of such a provision, is illegal and void. . . . [W]henever it appears that the enforcement of a contract would violate public policy the court should refuse to proceed in an action based solely upon it, and should dismiss the proceedings of its own motion."

588 A.2d 491, 495 (Pa. 1991) (quoting Dippel v. Brunozzi, 74 A.2d 112, 114-15 (Pa. 1950)).

On this record, however, summary judgment as a matter of law is not appropriate. In

addition, it is not necessary to decide whether § 477b applies to surplus lines, follow-form, and manuscript policies. These issues present mixed questions of fact and law, which will turn primarily on the credibility of the parties' experts and the factual foundation for their opinions. By its plain terms, § 477 applies to "any policy . . . or endorsements" sold by "any insurance company" "doing business in this Commonwealth." The parties present conflicting expert testimony about the Insurance Department's interpretation and application of § 477b to these types of policies. See Apr. 15, 2011 Cynthia R. Maleski Dep., and Mar. 16, 2011 Linda Kaiser-Conley Dep., Conley Aff. ¶¶ 4, 5, Exs. 2, 3 (doc. nos. 334, 334-1).[11]

Moreover, at the time the policies were sold, unlicensed surplus lines carriers were allowed to insure Pennsylvanians provided that "[t]he policy or contract form used by the insurer does not differ materially from policies or contracts customarily used by licensed insurers . . . ." 40 P.S. § 1006.4(a)(4) repealed and restated in 40 P.S. § 991.1604(3). The parties' experts do not agree on whether this provision requires surplus lines policies to conform to policy terms that have been approved pursuant to § 477b. The record does not reflect whether First State and Lexington complied with the statutory requirements for surplus lines activity in Pennsylvania.

Defendants also jointly move under Fed. R. Civ. P. 37(c)(1) to strike Power's affidavit. On July 28, 2011, it was submitted for the first time in a combined opposition-reply brief (doc. no. 334). However, the affidavit does not develop new issues. In 2004,

---

[11] See also GRC's fact witness, Powers, Conley Aff. ¶¶ 11, 13, 14, Ex.1 (doc. nos. 334, 334-1).

GRC filed the complaint that sets forth the public policy allegations. Defendants participated in extensive discovery focused on the Insurance Department's practices and procedures. Although discovery had closed before the affidavit was filed, GRC offered to make Powers available for deposition and stipulate to an enlargement of the deadline for defendants' reply brief. Defendants did not accept the offer and did not apply to the court for additional discovery.

Exclusion of the affidavit is not warranted – defendants are neither prejudiced in fact, nor surprised. See Canterna v. United States, 319 Fed. App'x 93, 98 (3d Cir. 2008) (citing Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 905 (3d Cir. 1977) ("exclusion of evidence is an 'extreme sanction'")). Defendants had the opportunity to request limited discovery, and, on July 19, 2011, Lexington and AIU did so in regard to other issues in this case, which request was granted. The court's interest in a complete evidentiary record for summary judgment prevails over defendants' litigation strategy in moving to strike the affidavit.

BY THE COURT:

/s/ Edmund V. Ludwig
Edmund V. Ludwig, J.