IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GENERAL REFRACTORIES COMPANY | : | CIVIL ACTION |
| | : | |
| v. | : | No. 04-3509 |
| | : | |
| FIRST STATE INSURANCE COMPANY, et al. | : | |

## MEMORANDUM

**L. Felipe Restrepo**, District Judge                                   March 3, 2015

Plaintiff General Refractories Company ("GRC"), a manufacturer and supplier of refractory products that at times contained some asbestos, sues its insurance carriers for a declaration of excess insurance coverage against underlying asbestos-related lawsuits and breach of insurance contract. Since about 1978, GRC has been named as a defendant in many asbestos-related suits throughout the United States. Each of those insurance carriers has now settled with GRC, except one – defendant Travelers Casualty and Surety Company, formerly known as The Aetna Casualty and Surety Company ("Travelers").[1]

A one-day bench trial was held on the proper interpretation of an "Asbestos Exclusion" contained in two insurance policies, which Travelers sold to GRC. See Trial record ("R."), transcript

---

[1]   On July 23, 2004, GRC commenced this action, which was assigned to the calendar of the Honorable Edmund V. Ludwig. On July 19, 2013, it was reassigned to the calendar of the Honorable L. Felipe Restrepo (doc. no. 501). By Order dated August 15, 2013 (doc. no. 509), Judge Restrepo notified counsel that this action would be tried consistent with Judge Ludwig's April 10, 2013 Order (doc. no. 482), which bifurcated the insurance regulatory issue for trial first. In addition, counsel were notified that "[a]s to all other matters in this case, this Court has adopted and will follow Judge Ludwig's previous rulings," and "those rulings will not be revisited." Aug. 15, 2013 Order (doc. no. 509).

A three-day jury trial was held. See Tr., dated Jan. 13, 14, and 15, 2014 (doc. nos. 590-593). The question presented to the jury was "whether the Pennsylvania insurance commissioner implemented a policy, which was uniformly executed by the insurance department, to disapprove all asbestos exclusions during the time frame at issue." Tr., 126:20-127:1, dated Jan. 14, 2014 (doc. no. 592); see also Tr., 18:22-19:4, 29:3-13, 249:8-14, dated Jan. 13, 2014 (doc. no. 590); Tr., 136:1-19, 156:16-24, dated Jan. 14, 2014 (doc. no. 592). The jury returned a verdict in favor of defendants, answering the question presented: "No." See Tr., 4:2-5:4, 5:13-25, dated Jan. 15, 2014 (doc. no. 593). On July 9, 2014, by a stipulated dismissal with prejudice (doc. no. 617), plaintiff GRC and all remaining defendants – except Travelers – settled this action.

dated Nov. 3, 2014 (doc. no. 634); insurance policies, defendant Travelers' trial exhibits ("D-1 through D-12"), <u>see</u> D-1 and D-2.  That Exclusion eliminates coverage for sums, which GRC becomes legally obligated to pay for injuries or loss "arising out of asbestos."  <u>Id.</u>  Both policies were in effect as of August 1, 1985, for a one-year period.  <u>Id.</u>; parties' stipulations, D-12 at ¶ 9.

Travelers maintains that the Exclusion is subject to only one reasonable interpretation: claims for injuries related to asbestos in any form are excluded.  R. 115:10-19.  This, Travelers asserts, is the natural, plain, and ordinary meaning of the terms, "arising out of asbestos."[2]  <u>Id.</u>

> Specifically, Travelers maintains that the phrase is a "broad" exclusion in the sense that
>
> asbestos meant asbestos.  It didn't mean asbestos in one particular form.  It meant asbestos, the stuff that was causing these injuries, causing these diseases and that was causing these lawsuits.

R. 125:9-13; <u>see also</u> R. 117:23-25 ("as broad as you could possibly make it").  Furthermore:

> It's the asbestos that [GRC] put in its products that caused [GRC] to be sued.  It's that asbestos which is excluded under the Travelers' policies.

R. 125:21-24.  Travelers' position is that injuries arising from mining, milling, or manufacturing raw asbestos are the same as those  arising from exposure to other finished products that contain only some of the mineral – they are not insured.  Travelers:  "It's all the same stuff because the harm is the fiber."  R. 121:21-22, 121:17-122:1.

---

[2]  The Court previously ruled on this assertion, rejecting Travelers' proffered plain-meaning theory. On August 1, 2011, Travelers moved for summary judgment "on the grounds that the Travelers Policies clearly and unambiguously do not provide coverage for the underlying asbestos-related claims asserted against GRC."  Def. mot., br. (doc. no. 338 at 15).  On March 21, 2012, the court denied the motion, ruling that there were factual issues for trial both as to the meaning of the exclusionary terms and their application to the allegations of the underlying lawsuits.  Order and Mem., dated Mar. 21, 2012 (doc. nos. 427, 428). The first issue for trial was identified as "[t]he meaning of the exclusionary terms as evidenced by custom in the industry and usage in trade."  <u>Id.</u> at 6.  The Court also ruled:  "The question whether the exclusionary terms contain ambiguity as applied to the allegations used in the underlying lawsuits cannot be determined on this record.  At present this question has been submitted solely on the parties' summary characterizations of the allegations."  <u>Id.</u>

GRC's position is that circa the late 1970s to 1985, "arising out of asbestos" did not mean the same thing as "arising out of asbestos-containing products."  R. 126:7-10, 126:22-25, 135:25-136:13.  "Asbestos," GRC maintains, plainly meant "a mineral" – that is, a physical substance mined, milled, processed, produced, or manufactured for sale in its raw form.  GRC did not make raw mineral asbestos products.  Instead, GRC made refractory products that at times contained some asbestos components.  GRC also maintains that it is insured against the underlying lawsuits, which sue "typically . . . for bodily injuries, diseases, and fear of contracting the same, allegedly resulting from exposure to asbestos-containing products manufactured, sold, and distributed by GRC." Compl. ¶ 23.

At trial, GRC presented extrinsic evidence showing how the insurance industry, insurance policies, and litigants of asbestos-related claims used and regarded comparable exclusions.  This evidence, GRC maintains, distinguishes the meaning and use of "arising out of asbestos" from "arising out of asbestos-containing products" for purposes of determining liability, damages, and insurance coverage.  R. 81:24-83:2.  This evidence, GRC also asserts, establishes that its proffered interpretation of the exclusionary terms is reasonable and gives insurance protection to GRC.

After considering the testimony of GRC's expert, Gene Locks, Esquire – who was the only live witness presented at trial, the deposition testimony of GRC's risk manager, Joseph Mulvaney, the parties' trial exhibits, the insurance policies' language and purpose as a whole, the parties' conflicting interpretations of the policies' exclusionary language, Pennsylvania's principles of contract construction, and relevant case law, the Court finds that the Asbestos Exclusion is ambiguous and must be construed in favor of insurance protection for GRC, the policyholder. Specifically, the Court finds and concludes as follows:

## I.     **FINDINGS OF FACT**

The "Asbestos Exclusion" contained in Travelers' policies states, in part:

It is agreed that this policy does not apply to the EXCESS NET LOSS[3] arising out of asbestos, including but not limited to bodily injury arising out of asbestosis or related diseases or to property damage.

Travelers' policies, D-1 and D-2; parties' stipulations, D-12 at ¶ 9.  The terms "arising out of" and "asbestos" are not defined in the policies.

As was previously ruled, Travelers drafted the Asbestos Exclusion.  See Mem., dated Mar. 21, 2012, at 3 (doc. no. 428).  The Exclusion was not specially crafted or designed for GRC, and GRC did not negotiate any of the exclusionary terms.  Id.  GRC received copies of the Exclusion only after the policies were sold.  Id.

GRC never mined, milled, processed, produced, or manufactured raw mineral asbestos.  GRC made and sold refractory products, which at times contained asbestos components.  See R. 37:18-38:14.  See also GRC's "Former Asbestos Containing Products," dated June 8, 1987, plaintiff GRC's trial exhibits ("P-1 through P-12, and P-14"), see P-1.  GRC used the term "asbestos" to refer to the mineral and used the phrase "asbestos-containing products" to refer to its refractory products.  Id.

On June 10, 2002, GRC first tendered to Travelers a claim for insurance coverage as to GRC's  potential liability for injuries alleged in the underlying lawsuits.  Travelers acknowledges as much.  See letter of Barry L. Katz, GRC's general counsel, dated June 10, 2002, D-11; Travelers'

---

[3] Each Travelers policy defines "EXCESS NET LOSS" as meaning:  "that part of the total of all sums which the INSURED becomes legally obligated to pay or has paid, as damages on account of any one accident or occurrence, and which would be covered by the terms of the Controlling Underlying Insurance, if written without any limit of liability, less realized recoveries and salvages, which is in excess of any self-insured retention and the total of the applicable limits of liability of all policies described in [the] Schedule of Underlying Insurance; whether or not such policies are in force."  D-1 and D-2.

findings of fact ("FF") and conclusions of law ("CL") (doc. no. 630), def. FF ¶ 7.  This was the first

time that GRC asked Travelers to perform under the insurance contracts.

At trial, GRC presented comparable policy forms that other insurance carriers had used circa

the late 1970s to 1985.  In one instance, American Empire's form was effective during the same

annual period as the policies at issue here.  P-6.  See also Orders, dated Jan. 16, 2009, and July 2,

2010 (doc. nos. 227 and 270) (Caracappa, J., compelling production of these forms).  See further

GRC's findings of fact  and conclusions of law (doc. no. 629), pl. FF  ¶¶ 28-36; policy forms, P-2

through P-10.  These forms evidence use of exclusions by major insurance companies during that

era, whose terms are comparable to those at issue here.

The  policy  forms  presented  by  GRC  distinguished  and  differentiated  "asbestos"  from

"asbestos-containing" materials and products, in part as follows:

- Republic Insurance Company's form, dated 11/1982:  "This policy is not applicable
to property damage arising from the disposal of any asbestos or asbestos-containing
material."  P-2; R. 39-40; pl. FF ¶ 29.

- Century Indemnity's form:  "We also will not protect nor defend against any claim
for liability relating in any way to asbestos or asbestos-containing materials you
assume under any contract or agreement."  P-3; R. 40-42; pl. FF ¶ 30.  It is not
disputed that the form was issued during 1978 to 1986.  R. 42:5-13.

- AIG's form, dated 5/1/1984:  "this policy shall not apply to liability of the insured
. . . arising out of the manufacturing, selling or distributing of products containing
asbestos."  P-4; R. 42-43; pl. FF ¶ 31.

- First State Insurance Company's form, dated 10/1/1979:  "this policy shall not apply
to any and all liability for past, present or future claims arising out of the
manufacture, distribution, installation or handling of asbestos or products containing
asbestos."  P-5; R. 43-44; pl. FF ¶ 32.

- American Empire's form, dated 1985 or 1986:  "this insurance does not apply to
bodily injury . . . arising out of the existence or manufacturing, sale, handling, use or
distribution of asbestos or of any product containing asbestos material."  P-6; R. 44-
45; pl. FF ¶ 33.

5

- GEICO's form, dated 10/1/1982 through 10/1/1983:  "this policy does not apply to any claim(s) arising out of the manufacture and/or distribution and/or handling in any fashion of asbestos products or products containing asbestos fibers and all claims resulting from asbestosis or any other asbestos related injuries or diseases."  P-7, R. 45-46, pl. FF ¶ 34.

- Republic Insurance Company's "Absolute Asbestos Exclusion," dated 5/1984:  "no coverage under this policy shall apply to any loss arising out of the sale, handling, or distribution of any asbestos product or any other product containing asbestos."  P-8; R. 46; pl. FF ¶ 35.

In addition, GRC presented Entertainment Brokers International's form, dated August 8, 1999, to demonstrate "that if there is an issue as to the meaning of a specific term, insurance companies know how to define a term."  R. 47-50.  That form defined "asbestos" broadly:

> As used in this exclusion, "Asbestos" includes, but is not limited to, the mineral asbestos in any form, asbestos fibers, asbestos dust, asbestos products, asbestos containing materials, and asbestos contained in any products, goods, materials, buildings, structures, or other real or personal property.

P-9; pl. FF ¶ 36.  See also The Hartford's form, which defined "asbestos" to mean "the mineral in any form, including but not limited to fibers or dust."  P-10; R. 50; pl. FF ¶ 36.

During October 1, 1978 though October 1, 1985, Travelers (formerly known as The Aetna) used a different "Asbestos Exclusion" in six consecutive policies sold to policyholders other than GRC.  That asbestos exclusion was more comprehensive than the one Travelers sold to GRC in 1985.  The Aetna's broader exclusion stated:

> [T]his insurance does not apply to bodily injury which arises in whole or in part, either directly or indirectly, out of asbestos, whether or not the asbestos is airborne as a fibre or particle, contained in a product, carried on clothing, or transmitted in any fashion whatsoever.

The Aetna's forms, P-11 at 208517, 208475, 208172, 208193, 208149, 208063.  See also R. 50-52; pl. FF ¶¶ 37-38.

At trial, GRC presented its expert, Gene Locks, Esquire,  who had represented "in excess of 15,000 claimants" in asbestos-related litigation.  R. 70:18-23.  Beginning in 1983, Locks was the lead negotiator at meetings among the plaintiffs' bar, target defendants in asbestos-related litigation, and six major insurance carriers for those defendants, including Travelers (then The Aetna).  R. 74:5-76:11.  Harry Wellington, Dean of Yale Law School, served as moderator at those meetings, which became known as the Wellington Group (R. 76:12-17), or the Asbestos Claims Facility (R. 77:19-22).  See pl. FF ¶ 39.

Ultimately, a settlement process was begun – known as the Wellington Agreement – between the plaintiff policyholders and the target defendant insurance carriers, including Travelers/The Aetna. "Agreement Concerning Asbestos-Related Claims," dated June 19, 1985, P-12; R. 85:7-12.  See pl. FF ¶¶ 39, 41.  In defining the scope of claims for resolution, the Wellington Agreement made a distinction between "asbestos" and "asbestos-containing products," in part as follows:

> Asbestos-Related Claims – means any claims or lawsuits . . . seeking monetary relief . . . for bodily injury, sickness, disease or death, alleged to have been caused in whole or in part by any asbestos or asbestos-containing products.

P-12 at 15; see also R. 86:3-14.  See pl. FF ¶¶ 40-42.

Locks testified that during the late 1970s to 1985, the terms "asbestos" and "asbestos containing product" had distinct meanings and usages:

> [b]ecause asbestos was the raw fiber.  Asbestos containing products were products manufactured by companies that sold them in interstate commerce that contained some asbestos fiber.

R. 86:8-14, 81:7-83:9.  Distinctions were made based on the degree of danger associated with a business' production activities and the varying risks accompanying different products.  R. 81:24-83:2.  Locks testified that distinctions were made for determining liability, damages, and insurance

coverage.[4]  He was asked, "did you ever encounter a defendant, their counsel or an insurance company who argued that asbestos meant the same thing as asbestos-containing product?"  Locks answered: "No.  The distinction was always made.  We make an asbestos-containing product.  We don't make the asbestos."  R. 84:6-11; <u>see also</u> R. 82:9-83:9, 92:16-93:4; pl. FF ¶ 40.

Travelers presents extrinsic materials described as "GRC's corporate records, as well [as] its communications with Travelers and its own insurance broker."  Def. FF ¶ 12; D-4 through D-11.  Travelers argues that the materials confirm the parties' intent to exclude – or, their awareness, belief, or knowledge that the purchased insurance did exclude – all injuries related to asbestos in any form, including injuries arising from GRC's refractory products.  <u>See, e.g.</u>, def. FF ¶¶ 12-26.  The materials use the term, "asbestos."  However, none says anything about the meaning of "arising out of asbestos" or GRC's proffered interpretation of that phrase – specifically, that it refers to the mineral "asbestos," which is a distinct risk of loss from "asbestos-containing products."

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction and Governing Law

Jurisdiction is diversity, 28 U.S.C. § 1332.  The parties agree that Pennsylvania law applies.  <u>See</u> <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 78-80 (1938).  Here, there is no controlling decision

---

[4]  Locks testified: "[O]ne of the main distinguishing features of the . . . manufacturers of asbestos-containing products was that their products only contained a portion, percentage-wise, of asbestos and that was different than the asbestos fiber that was mined . . . and used in their products. . . . They also defended claiming that their products that contained asbestos had sometimes encapsulation, meaning it didn't create dust.  It wasn't dusty like the raw fiber that was used in the manufacturing process.  So they always tried to defend that either they had limited amount of asbestos in their products or that their products didn't create the kind of dust that was created when it was in the mining process in Canada or wherever it was."  R. 82:9-83:2.  "Up until early '73 . . . , all claims of any kind only dealt in the mining milling manufacturing industry. . . . Third-party claims arose and really began to skyrocket in the late 70s and the 80s.  They always tried to defend by saying that all of the historic information about the dangers of asbestos were in the mining and milling raw fiber industry[,] not on the products that they were making."  R. 83:10-18; <u>see also</u> R. 94:21-95:2.

by the state's highest court interpreting the exclusionary terms, "arising out of asbestos."   A prediction as to how the Supreme Court of Pennsylvania would rule must be made, giving "due regard, but not conclusive effect," to the decisional law of Pennsylvania's intermediate courts. Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir. 2000).

### B.      Interpretation and Application of the Asbestos Exclusion

Analysis begins with the language of the insurance policy.  Meyer v. Cuna Mut. Ins. Soc'y, 648 F.3d 154, 163 (3d Cir. 2011) (citing Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999) (language is "the polestar")).  The mutual intention of the parties at the time they formed the contract "governs its interpretation" and "is to be inferred from the written provisions of the contract." Post v. St. Paul Travelers Ins. Co., 691 F.3d 500, 517 (3d Cir. 2012) (citations and internal quotation marks omitted).  "The goal in construing and applying the language of an insurance contract is to effectuate the intent of the parties as manifested by the language of the specific policy." Pa. Nat'l Mut. Cas. Ins. Co. v. St. John, --- A.3d ----, 2014 WL 7088712, at *12 (Pa. Dec. 15, 2014).  Also, a " policy must be read as a whole and its meaning construed according to its plain language." Meyer, 648 F.3d at 163; accord Post, 691 F.3d at 517.  Pennsylvania's "courts must give plain meaning to a clear and unambiguous contract  provision." Heller v. Pa. League of Cities & Mun., 32 A.3d 1213, 1220 (Pa. 2011).

"The insurer bears the burden of proving the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the basis of an exclusion is an affirmative defense." Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1446 (3d Cir. 1996).  Accord Madison Constr., 735 A.2d at 106; Wall Rose Mut. Ins. Co. v. Manross, 939 A.2d 958, 962 (Pa. Super. Ct. 2007), appeal denied, 946 A.2d 688 (Pa. 2008).

9

Pennsylvania's courts strictly and narrowly interpret policy exclusions:  "An exclusion from liability must be clear and exact and unambiguous to be given effect."  Wall Rose, 939 A.2d at 963 (citing Prudential Prop. & Cas. Ins. Co. v. Sartno, 903 A.2d 1170, 1177 (Pa. 2006)).  Accord: Devcon Int'l Corp v. Reliance Ins. Co., 609 F.3d 214, 218 (3d Cir. 2010) (citing Nationwide Mut. Ins. Co. v. Cosenza, 258 F.3d 197, 206-07 (3d Cir. 2001)); Pacific Indem. Co. v. Linn, 766 F.2d 754, 761 (3d Cir. 1988) (under Pennsylvania law, exclusions from coverage will be effective against an insured only if they are "clearly worded").

If doubt or ambiguity exists about the parties' mutual intention as manifested by the contract's written provisions, "it should be resolved in the insured's favor." Post, 691 F.2d at 517. "[T]he burden of drafting with precision rests with the insurance company, the author of the policy." Meyer, 648 F.3d at 163 (citing J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 365 (3d Cir. 2004)). Moreover, "under Pennsylvania law, in close cases, a court should resolve the meaning of insurance policy provisions in favor of coverage for the insured."  Id. at 167 (citing Motley v. State Farm Mut. Auto. Ins. Co., 466 A.2d 609, 611 (Pa. 1983) (any error in determining the meaning of a policy provision "should be in favor of coverage")).  Where "more than one reasonable construction exists, the construction that favors coverage must be applied." Celley v. Mut. Benefit Health & Accident Ass'n, 324 A.2d 430, 434-35 (Pa. Super. Ct. 1974).

"An ambiguity in contract language exists 'when the questionable term or language, viewed in the context of the entire policy, is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" Meyer, 648 F.3d at 163 (quoting Pilosi, 393 F.3d at 363) (citation and internal quotations marks omitted); accord St. John, 2014 WL 7088712, at *12 ("language is ambiguous if it is reasonably susceptible to more than one construction and meaning").

10

"Where a term is ambiguous, it is to be construed against the insurer, in favor of the insured."

Meyer, 648 F.3d at 163-64 (citing McMillan v. State Mut. Life Assurance Co. of Am., 922 F.2d

1073, 1075 (3d Cir. 1990) (citing Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d

563, 566 (Pa. 1983)).

### 1. The Plain Meaning of "Arising Out of Asbestos" Is Ambiguous

Looking first to the language of the Asbestos Exclusion, words of common usage contained

in an insurance policy should be construed in their natural, plain, and ordinary sense. Meyer, 648

F.3d at 164 (citing Madison Constr., 735 A.2d at 108). In doing so, dictionary definitions may be

considered. Id.; Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co., 908

A.2d 888, 897 (Pa. 2006).

In ordinary English usage, a noun – for example, a person, place, or thing – is a subject of

discourse, a subject or object of a verb, or an object of a preposition. When "asbestos" is used as

a noun, it means a physical substance, a "mineral":

- Merriam Webster's Collegiate Dictionary, at 71 (11th ed. 2005): "any of several minerals (as chryosotile) that readily separate into long flexible fibers"

- Webster's Third New International Dictionary ("Webster's"), at 126 (1993): "a mineral (as chrysotile, tremolite, or actinolite) that readily separates into long flexible fibers suitable for use where incombustible, nonconducting, or chemically resistant materials is required"

- Random House Dictionary of the English Language ("Random House"), at 120 (2d ed. 1987): "a fibrous mineral, either amphibole or chrysotile, formerly used for making incombustible articles"

English speakers commonly use nouns to describe other nouns. When they do, the first noun

functions as an adjective. A common example is "apple juice." "Asbestos" is commonly used in

this way too. As an adjective, "asbestos" modifies another noun, denoting that subject's quality or

composition – that it is "made of, containing, or resembling asbestos." Webster's, at 126.

11

The common usage of the word "asbestos" reveals a latent ambiguity as to what it denotes. Is the word being used to refer only to the mineral in a raw, relatively unprocessed state? Does it refer to mineral particles, fibers, or dust as well? Or instead, is the word being used more expansively to refer to a myriad of other materials and products that incorporate greater or lesser quantities of the mineral?[5] Here, the parties' positions mirror this latent ambiguity in common usage: Should "asbestos" be ruled to refer only to the raw mineral, as proposed by GRC, or should "asbestos" be ruled to be a generic catch-all term that refers not only to the mineral, but also to other finished products that are made or contain some of the mineral, as proposed by Travelers?

At the threshold, Travelers is mistaken that "arising out of asbestos" should be interpreted broadly. See, e.g., def. FF ¶ 35; R. 136:25-137:11. Pennsylvania's law requires that exclusions be strictly and narrowly interpreted to favor coverage for the insured. Sartno, 903 A.2d at 1177; Peters v. Nat'l Interstate Ins. Co., --- A.3d ----, 2014 WL 7140532, at *3 (Pa. Super. Ct. Dec. 16, 2014) ("strictly construed against the insurer and in favor of the insured") (quoting Swarner v. Mut. Benefit Grp., 72 A.3d 641, 644-45 (Pa. Super. Ct. 2013), appeal denied, 85 A.3d 484 (Pa. 2014)); Wall Rose, 939 A.2d at 963; Eichelberger v. Warner, 434 A.2d 747, 750 (Pa. Super. Ct. 1981); Miller v. Prudential Ins. Co. of Am., 362 A.2d 1017, 1020 (Pa. Super. Ct. 1976); Celley, 324 A.2d at 434-35.

Viewed narrowly and strictly interpreted from the standpoint of common English usage, "asbestos" and "arising out of asbestos" are used, respectively, as a noun and a verbal noun-phrase

---

[5] For example, "Asbestos curtain" is "a fireproof curtain made of asbestos or other material and used in a theater to close the proscenium opening in case of fire." Webster's, at 126. "Asbestos cement" is "a compound of asbestos fiber and Portland cement formerly used for various nonstructural building purposes." Random House, at 120. Other common examples: asbestos brake linings, asbestos cloth covers, asbestos compound, asbestos insulation, asbestos shingles, asbestos glue, etc. Each might be composed of more or less asbestos. Some might only resemble asbestos' fire-resistant quality.

modifying "EXCESS NET LOSS."  In this use, "asbestos" is commonly defined to mean a physical substance, a mineral.  This is GRC's position:  "Asbestos means asbestos, a mineral."  Pl. br. at 13 (doc. no. 632).  However, GRC further submits:  "the exclusion for 'EXCESS NET LOSS arising out of asbestos' is unambiguous, and does not apply to GRC's loss arising from GRC's asbestos-containing products."  Pl. CL ¶ 26 (doc. no. 629).  The Exclusion is not "unambiguous."  Id.  It incorporates the same latent ambiguity found in common usage of the English word "asbestos."

GRC presented evidence of insurance industry usage to resolve any ambiguity found in the plain meaning of the exclusionary terms, but Travelers did not, saying:  "Which gets us right back to where Travelers began with this case, which is that you just need to look at the words of the exclusion."  R. 117:5-7.  Yet as to those words, Travelers presents more than one plain-meaning theory – in particular, that common law tort principles determine the plain meaning of the terms:

> Mr. Locks testified that asbestos in any form causes asbestos disease.  That's what all the litigation is about.  It's about asbestos.

> [E]ven as Mr. Locks testified if someone has an asbestos disease, it's from asbestos. It doesn't matter if it came from something that was from a guy that was milling it or mining it or it was someone who worked down at the Philadelphia Navy yard who was installing pipe covering or something.  It's all the same stuff because the harm is the fiber.

R. 118:16-18; 121:15-22 .  All of the plain-meaning theories – including Travelers' current version based on tort liability for asbestos-related bodily injury – were previously considered on the parties' cross-motions for summary judgment and rejected.  See Order, dated Apr. 27, 2012 (doc. no. 459) and Mem., dated May 4, 2012, at 6-8 (doc. no. 462); footnote 2, supra.  The argument remains unpersuasive.  The mutual intention of the parties is to be inferred the written provisions of the policy.  St. John, 2014 WL 7088712, at *12.  Interpretation of contract terms is not controlled or

affected by causation analyses used in determining the insured's liability.  See, e.g., Vermont Mut. Ins. Co. v. Walukiewicz, 966 A.2d 672, 681 & n.18 (Conn. 2009) (rule of intent used in tort and criminal law should not control interpretation of an intentional injury exclusion).

As between Travelers and GRC, which proffers the more reasonable interpretation of the Asbestos Exclusion is not decided here.  It is ruled only that GRC's interpretation of "arising out of asbestos" is consistent with the plain meaning of the written policy terms and common English usage.  That is, GRC's interpretation is objectively reasonable.  Travelers has not met its burden of showing that GRC's interpretation is not reasonable.  Because the exclusionary terms are reasonably capable of being understood in more than one sense, the Exclusion is ambiguous.

## 2. As Evidenced by Custom in the Insurance Industry and Trade Usage, "Asbestos" Means a Mineral, Not an Asbestos-Containing Product

As previously ruled here, "[t]he meaning of the exclusionary terms as evidenced by custom in the industry and usage in trade" is required.  Order and Mem., dated Mar. 21, 2012, at 6 (doc. nos. 427, 428).  "Whether ambiguity exists cannot be resolved in a vacuum, . . . but must instead be considered in reference to a specific set of facts."  Lititz Mut. Ins. Co. v. Steely, 785 A.2d 975, 978 (Pa. 2001) (citing Madison Constr., 735 A.2d at 106); accord Kropa v. Gateway Ford, 974 A.2d 502, 508 (Pa. Super. Ct. 2009), appeal denied, 990 A.2d 730 (Pa. 2010).

Pennsylvania follows the Restatement (Second) of Contracts § 202 (1981) ("Restatement") to interpret written, integrated contracts, such as the insurance policies here.  AstenJohnson, Inc. v. Columbia Cas. Co., 562 F.3d 213, 220 (3d Cir. 2009) (citing Sunbeam Corp. v. Liberty Mut. Ins. Co., 781 A.2d 1189 (Pa. 2001), cert. denied, 558 U.S. 991 (2009)).  Under that approach, "[p]arole evidence cannot be used to contradict the provisions of such a contract."  Id.  Before finding a contradiction, "the text of the contract must first be interpreted in light of any evidence of trade usage

and the performance of the parties under the contract." Id. (citing Sunbeam, 781 A.2d at 1193);

accord Hussey Copper, Ltd. v. Arrowood Indem. Co., 391 F. App'x 207, 210-11 (3d Cir. 2010).

Even absent a showing of ambiguity, evidence of a specialized usage may be offered:

In the law of contracts, custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract.

Sunbeam, 781 A.2d at 1193; see also Restatement § 202, cmt. a (rules in aid of interpretation do not

depend on any determination of ambiguity"); id. § 220 cmt. d ("no requirement that an ambiguity

be shown before usage can be shown"). This evidence may be "'used as a mode of interpretation

on the theory that the parties knew of its existence, and contracted with reference to it.'" Simon

Wrecking Co., Inc. v. AIU Ins. Co., 530 F. Supp. 2d 706, 715 (E.D. Pa. 2008) (quoting Barnard v.

Kellogg, 10 Wall. 383, 77 U.S. 383, 390 (1870)).

GRC presented evidence that at times duirng the late 1970s to 1985, insurance carriers used

more precise exclusions than Travelers used in the policies sold to GRC. Those forms expressly and

distinctly excluded losses arising from products that contained asbestos. Those forms are strong

evidence that the parties here contracted with reference to a specialized meaning of "arising out of

asbestos" that did not signify or encompass asbestos-containing products.

Pennsylvania's "rules of construction do not permit words in a contract to be treated as

surplusage . . . if any reasonable meaning consistent with the other parts can be given to it.'" Clarke

v. MMG Ins. Co., 100 A.3d 271, 276 (Pa. Super. Ct. 2014) (quoting Tenos v. State Farm Ins. Co.,

716 A.2d 626, 631 (Pa. Super. Ct. 1998)). "Indeed, if the court is 'forced to choose between two

competing interpretations of an insurance policy, we are bound, as a matter of law, to choose the

interpretation which allows us to give effect to all of the policy's language.'" Id. (quoting Miller

15

<u>Capital Ins. Co. v. Gambone Bros. Dev. Co., Inc.</u>, 941 A.2d 706, 716 (Pa. Super. Ct. 2007), <u>appeal denied</u>, 963 A.2d 471 (Pa. 2008)). "[A] principle frequently applied as an aid in arriving at the policy's intention is that the mention of one thing implies the exclusion of another thing.'" <u>Id.</u>

Under these rules of construction, distinct sequentially-excluded risks of loss should not be viewed as surplusage. Here, each of the exclusions that GRC submitted specified distinct risks of loss in a series – <u>e.g.</u>, "asbestos," followed by "products containing asbestos," etc. <u>See</u> forms, P-2 through P-8. The terms denoting those risks are not redundant and are not interchangeable synonyms. "Asbestos" does not subsume "asbestos-containing products," as Travelers suggests.

Travelers contends that GRC's evidence does not establish a sufficiently prevalent and regular meaning of "arising out of asbestos" to constitute competent evidence of the parties' mutual intention. <u>See, e.g.</u>, R. 122:17-123:14, 124:2-11. However, "to be an interpretation aid, trade usage evidence need not demonstrate that a particular term always carries a particular meaning or that the particular meaning claimed cannot be otherwise stated." <u>AstenJohnson</u>, 562 F.3d at 222. The record shows that during the late 1970s to 1985, six major insurance companies and other industry-participants commonly used "asbestos" to refer to risks of loss associated with the raw mineral, and used "asbestos-containing products" to refer to different risks of loss. This is enough to establish the proffered special meanings of these terms. <u>See</u> <u>M & G Polymers USA, LLC v. Tackett</u>, 135 S. Ct. 926, 935 (U.S. 2015) ("Although a court may look to known customs or usages in a particular industry to determine the meaning of a contract, the parties must prove those customs or usages using affirmative evidentiary support in a given case.") (citing 12 Richard A. Lord, <u>Williston on Contracts</u> § 34:3, pp. 31-39 (4th ed. 2012)); <u>Doyle v. Atl. Refining Co.</u>, 53 A.2d 68, 71 (Pa. 1947) (the proponent must establish "a custom that was certain, reasonable, distinct, uncontradicted,

continued, and so notorious as to be probably known to all parties to be controlled") (internal quotation marks and citation omitted).

Importantly, circa the late 1970s to 1985, Travelers (The Aetna) used a different asbestos exclusion in policies sold to insureds other than GRC. That exclusion specified a broad scope of excluded risks: "asbestos, whether or not the asbestos is airborne as a fibre or particle, contained in a product, carried on clothing, or transmitted in any fashion whatsoever." P-11. Our Court of Appeals instructs that such evidence should be considered where "'alternative or more precise language, if used, would have put the matter beyond reasonable question' in resolving ambiguity." Meyer, 648 F.3d at 165 (quoting Vlatos v. Sumitomo Marine & Fire Ins. Co. (Europe) Ltd., 707 F.2d 775, 778 (3d Cir. 1983) (quoting Celley, 324 A.2d at 434-35)) (internal quotation marks omitted).

Travelers chose not to define "asbestos" in the policies sold to GRC. Also, more precise, broader exclusionary language could have been but was not used. On these facts, it is fair to interpret "asbestos" in favor of coverage for the policyholder, GRC. See Sartno, 903 A.2d at 1178 (ruling for the insured where insurer "was free to exclude" certain activities, but did not do so); Smith v. Life Investors Ins. Co. of Am., No. 2:07-cv-681, 2009 WL 3756911, at *5 (W.D. Pa. Nov. 6, 2009) (same where the insurer "knew how to draft" a more precise provision," but did not do so).

Gene Locks corroborated that during the late 1970s to 1985, the insurance industry and litigants of asbestos-related claims made distinctions in order to evaluate liability, damages, and insurance coverage. For these goals, risks of loss presented by handling raw asbestos were distinguished from those presented by making or supplying asbestos-containing products. Locks had personal knowledge of the distinctions made on an industry-wide basis in nationwide litigation of asbestos-related claims. He was credible and persuasive. Travelers did not present any witnesses.

17

The Wellington Agreement was an accord among some of the largest insurance carriers at that time, including Travelers, and plaintiff policyholders nationwide.  See Agreement, Whereas Clauses, P-12.  Any insurer could become a signatory on or before June 19, 1985.[6]  Id., General Conditions, ¶ 1.  Participants instituted coverage standards and claims resolution procedures for the litigation taking place throughout the country between asbestos manufacturers and their insurers.  For purposes of defining the scope of the claims to be resolved, the Agreement distinguished between "asbestos" and "asbestos-containing products."  See Pl. FF ¶¶ 39-42.  This too evidences that the insurance industry frequently used those terms with distinct, specialized meanings.

The Wellington Agreement is comparable to documentary evidence of industry usage that Pennsylvania's Supreme Court found persuasive in Sunbeam:

> Certainly one memorandum does not create a custom.  Yet it is strong evidence that a custom exists, particularly when it was drafted by a consortium of insurers purporting to represent the industry as a whole.

781 A.2d at 1194.  In that case, insured manufacturers maintained that industry usage supported a finding that certain terms in a pollution exclusion had a specialized meaning.  Similarly here, it is proper to consider an agreement setting forth the position of members of the insurance industry on the challenged exclusionary terms, "asbestos" versus "asbestos-containing products."

GRC's interpretation of "arising out of asbestos" is not only consistent with the plain meaning of the written exclusion and common English usage, but also it is objectively reasonable on another ground:  It is supported by evidence of insurance industry custom and trade usage.  During the relevant era, industry participants used the phrase to denote losses arising from mining,

---

[6]  For the history of the Wellington Agreement, see generally:  Flintkote Co. v. Aviva PLC, 769 F.3d 215, 217 (3d Cir. 2014); N. River Ins. Co. v. ACE Am. Reinsurance Co., 361 F.3d 134, 137-38 & n.4 (2d Cir. 2004); In re Nat'l Gypsum Co., 208 F.3d 498, 502 (5th Cir. 2000).

milling, producing, processing, or manufacturing the raw mineral.  The phrase did not  denote finished products – such as GRC's refractory products that only contained some asbestos components supplied by other manufacturers.  No evidence controverting these findings was presented.  Moreover, this construction is consistent with the general purpose of products liability insurance:  "The primary aim of third-party insurance is to defend and indemnify insureds against liability for claims made against them as a result of their own conduct."  Port Auth. of N.Y. & N.J., 311 F.3d 226, 233 (3d Cir. 2002).  Here, the exclusion is construed to protect the policyholder, GRC, against liability claims for injuries to others caused by the refractory products that GRC made.

### C.  Travelers' Extrinsic Materials Do Not Evidence Repeated Occasions for Performance by Either Party Under the Insurance Policies

Under Pennsylvania law, the course of performance may always be considered as evidence of the intent of the parties.  In re Old Summit Mfg., LLC, 523 F.3d 134, 137-38 (3d Cir. 2008). "'The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.'"  Atl. Richfield Co. v. Razumic, 390 A.2d 736, 741 n.6 (Pa. 1978) (following and quoting Restatement § 228, cmt. g (Tent. Draft No. 5, 1970)).  In part, the Restatement § 202 (4) provides:

> Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

This rule "does not apply to action on a single occasion or to action of one party only; in such cases . . . self-serving conduct is not entitled to weight."  Id., § 202 (4), cmt. g.

The extrinsic materials presented by Travelers do not show repeated occasions for performance by either party.  See D-4 through D-11; def. br., ex. 1(doc. no. 633).  With one

exception, none evidences any performance at all under the insurance contracts.  That one exception is GRC's letter, dated June 10, 2002, "tendering asbestos related claims to its excess insurance carriers, including Aetna."  D-11.  Ordinarily, the carrier's performance is not triggered until the policyholder requests that the carrier defend.  See, e.g., Widener Univ. v. Fred James & Co., Inc., 537 A.2d 829, 832 (Pa. Super. Ct. 1988) (citing Hartford Accident & Indem. Co. v. Gulf Ins. Co., 776 F.2d 1380, 1383 (7th Cir. 1985)).  Travelers acknowledges that after GRC's tender, it denied coverage.  Other than a tender of claims followed by a denial of coverage, the record is devoid of evidence of either party's performance.

Travelers also argues that these materials evidence GRC's acceptance or acquiescence in the plain meaning that Travelers gives to "arising out of asbestos."  This position is also without merit.  Travelers reads into the materials its own understanding of the exclusionary term "asbestos," and then ascribes its beliefs to GRC.  See, e.g., R. 119:10-13, 119:14-18, 119:25-120:20, 120:21-121:3; 121:10-22.  This is not enough.  The inquiry here is guided by the written terms of the policies, not by "an impermissible analysis of the parties' subjective intent."  Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 93-94 & n.3 (3d Cir. 2001) (Becker, J.), cert. denied, 534 U.S. 1162 (2002).  Moreover, a party "cannot simply show that the parties' intended something different that was not incorporated into the contract."  Id.  Travelers has not  provided any information as to how GRC objectively manifested its understanding of the exclusionary terms.

Within the extrinsic materials presented, Travelers cites examples of GRC's use of "asbestos" to modify various other nouns – e.g., "asbestos claims," "asbestos litigation," "asbestos coverage," etc. R. 119:17-24, 120:22-25, 121:10-13.  This does not prove that GRC shared – either objectively or subjectively – the plain meaning of "asbestos" that Travelers proffers.  It shows only

that GRC, just like any other English speaker, used the word as it is commonly used in everyday, business communications as both a noun and an adjective.[7]

## III.  CONCLUSION

As between the parties' conflicting interpretations of the Asbestos Exclusion, it need not be decided which is the more reasonable.  Each is not without its objective reasons.  Yet, in order to prevail, Travelers must show not only that its interpretation is reasonable, but also that GRC's interpretation is not reasonable.  This has not been done.  Accordingly, the Exclusion's phrase – "arising out of asbestos" – is ambiguous.  In other words, it is reasonably susceptible of different constructions and capable of being understood in more than one sense.  This requires a ruling that favors insurance protection for the policyholder, GRC.  That ruling is:  the Asbestos Exclusion is not enforceable, and it is not effective to preclude insurance coverage for GRC against the claims made in the underlying asbestos-related lawsuits.  An appropriate Order follows.

---

[7]  In Section F of its brief, Travelers mistakenly asserts that yet another trial is required for the factfinder to consider evidence of the parties' intent, including pre- and post-contract formation evidence.  See def. br., at 20-24 (doc. no. 631).  During the bench trial, however, Travelers was permitted to introduce into the record whatever extrinsic materials it chose to present – nothing was precluded or excluded.  It is fair to conclude that there is no more, as yet unpresented evidence of the parties' intent as to the meaning of the policy terms, "arising out of asbestos."  The record does not suggest otherwise as well.