## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GENERAL REFRACTORIES COMPANY | : | CIVIL ACTION |
| | : | |
| v. | : | No. 04-3509 |
| | : | |
| FIRST STATE INSURANCE COMPANY, et al. | : | |

*FILED*

*MAY 29 2015*

### *MEMORANDUM*

*MICHAEL E. KUNZ, Clerk*
*By_____Dep. Clerk*

**L. Felipe Restrepo**, District Judge

May 29, 2015

Plaintiff General Refractories Company ("GRC"), a manufacturer and supplier of refractory

products that at times contained some asbestos, sues its insurance carriers for a declaration of excess

insurance coverage against underlying asbestos-related lawsuits and for breach of insurance contract.

Since about 1978, GRC has been named as a defendant in a multitude of asbestos-related suits

throughout the United States. Each of those insurance carriers has now settled with GRC, except

one – Defendant Travelers Casualty and Surety Company, formerly known as The Aetna Casualty

and Surety Company ("The Aetna") (collectively, "Travelers"). A jury trial is scheduled for June

15, 2015. Order, dated Mar. 3, 2015, ¶ 4 (doc. no. 642).[1]

---

[1] On July 23, 2004, GRC commenced this action, which was assigned to the calendar of the Honorable Edmund V. Ludwig. On July 19, 2013, it was reassigned to the calendar of the Honorable L. Felipe Restrepo (doc. no. 501). By Order dated August 15, 2013 (doc. no. 509), Judge Restrepo notified counsel that this action would be tried consistent with Judge Ludwig's Order dated April 10, 2013 (doc. no. 482), which bifurcated the insurance regulatory issue for trial first. In addition, counsel were notified that "[a]s to all other matters in this case, this Court has adopted and will follow Judge Ludwig's previous rulings," and "those rulings will not be revisited." Order, Aug. 15, 2013 (doc. no. 509).

A three-day jury trial was held. See Trial record ("R."), transcripts dated Jan. 13, 14, and 15, 2014 (doc. nos. 590-593). The question presented to the jury was "whether the Pennsylvania insurance commissioner implemented a policy, which was uniformly executed by the insurance department, to disapprove all asbestos exclusions during the time frame at issue." R. 126:20-127:1, dated Jan. 14, 2014 (doc. no. 592); see also R. 18:22-19:4, 29:3-13, 249:8-14, dated Jan. 13, 2014 (doc. no. 590); R. 136:1-19, 156:16-24, dated Jan. 14, 2014 (doc. no. 592). The jury returned a verdict in favor of defendants, answering the question presented: "No." See R. 4:2-5:4, 5:13-25, dated Jan. 15, 2014 (doc. no. 593). On July 9, 2014, by a stipulated dismissal with prejudice (doc. no. 617), Plaintiff GRC and all remaining Defendants – except Travelers – settled this action.

On November 3, 2014, a bench trial was held as to the meaning of the "Asbestos Exclusion" contained in two insurance policies that Travelers sold to GRC, providing excess liability coverage for a

The parties were heard as to "what adjudication, if any, is required going forward to achieve a prompt and complete resolution of this action." Order, dated Mar. 3, 2015 (doc. no. 638); Hr'g Tr., 30:3-13, 35:10-36:6, 42:13-43:3, dated Mar. 24, 2015 (doc. no. 644). This Memorandum decides the first of the pretrial motions identified by the parties and permitted by the Court.[2]

Under Rule 1006 of the Federal Rules of Evidence, Defendant Travelers moves to preclude Plaintiff GRC from introducing at trial a summary – the "Queue" – evidencing settlements of claims asserted against GRC in the underlying asbestos-related lawsuits. See Def. Mot., Br. at 1-2 (doc. nos. 650, 650-1). The motion contends that GRC has not produced the "actual," "final," and "complete" summary that GRC intends to introduce at trial. Id. at 1, 5-7. It is also contended that GRC "has refused" Travelers' request to review documents supporting the summary and has failed to make them available. Id. at 2, 11-12. The motion acknowledges receipt of versions of the summary, criticizing them as inaccurate and "missing significant pieces of information" Id. at 2, 6, 10. Travelers' reply brief asserts these objections as to a separate summary proffered by GRC – the "Claims Database – which also records information about the underlying claims. Def. Reply at 1-2 (doc. no. 659). This summary, it is said, "bears some of the same deficiencies as the Queue." Id.

---

one-year period, August 1, 1985 to August 1, 1986. See R., transcript dated Nov. 3, 2014 (doc. no. 634); Travelers' policies, Def. Trial Exs., D-1, D-2; parties' Stipulations, D-12 at ¶ 9. That Exclusion eliminates insurance for sums, which GRC becomes legally obligated to pay for injuries or loss "arising out of asbestos." Def. Trial Exs., D-1 and D-2. It was ruled that the Exclusion is ambiguous, which requires a ruling that favors coverage for the policyholder, GRC: "That is, the Asbestos Exclusion is not enforceable and is not effective to preclude insurance coverage for GRC against underlying asbestos-related lawsuits, which sue 'typically . . . for bodily injuries, diseases, and fear of contracting the same, allegedly resulting from exposure to asbestos-containing products manufactured, sold, and distributed by GRC.'" Order and Mem., dated Mar. 3, 2015 (doc. nos. 637, 636) (quoting Compl. ¶ 23); Gen. Refractories Co. v. First State Ins. Co., No. 04-3509, --- F. Supp. 3d ----, 2015 WL 918797 (E.D. Pa. Mar. 3, 2015) (Restrepo, J.).

[2] Orders, dated Mar. 24 and 25, 2015 (doc. nos. 642, 643). See the parties' respective Statements of issues for adjudication (doc. nos. 639, 640). As permitted, GRC filed two motions (doc. nos. 647, 648), and Travelers filed three motions (doc. nos. 649, 650,651).

GRC maintains that under Rule 803(6) of the Federal Rules of Evidence, the Claims Database and the Queue are admissible summaries of business records. Pl. Resp. at 8-9 (doc. no. 656). GRC also responds that during discovery, Travelers received multiple updated copies of the Claims Database and the Queue, and Travelers had "unfettered access to all of the documents that support the Claims Database and the Queue." Id. at 5, 3-7. In addition, GRC asserts that Travelers, "as a primary insurer for GRC, and as a litigant in this matter for over ten years, . . . had access to not only GRC's current claims information, but also its historic information as well." Id. at 1-3.

Specifically, GRC proffers the Queue, an itemized summary spreadsheet, to evidence settlements in excess of $120 million. See Pl. Br. in Support of Mot. Summ. J. at 5 (doc. no. 647-1) (citing Affidavit of Michael Conley ("Conley Aff.") ¶ 4, dated April 17, 2015 (doc. no. 646)). The Queue incorporates information taken from the Claims Database. The Queue lists about 31,440 to 34,440 claims for asbestos-related bodily injury claims asserted against GRC. It lists about 25,104 settlements by GRC of those claims. Declaration of Michael Conley ("Conley Decl.") ¶ 16, dated May 1, 2015 (doc. no. 657). About 3,145 of the settled claims have been paid for a sum that totals $19,599,066. Conley Aff. ¶ 4 (doc. no. 646); Pl. Resp. at 6 (doc. no. 656).

The Queue is "not a static document." Pl. Resp. at 9 (doc. no. 656). GRC continues to be sued, and to defend and settle, underlying asbestos-related claims. The Claims Database and the Queue record new information as it is presented to GRC. Both databases incorporate information from documents warehoused in Pottstown, Pennsylvania and Dallas, Texas. Id. at 2. In large part, claimants' counsel submitted those documents to support settlements of the underlying claims. See generally Hr'g Tr., 3:22-7:9, dated Mar. 24, 2015 (doc. no. 644).

3

GRC correctly notes that Travelers' motion does not identify a single, specific entry in the proffered summaries as being faulty, inaccurate, or otherwise deficient. See, e.g., Pl. Resp. at 1, 10 (doc. no. 656). Travelers does not dispute this, replying only that "GRC is required to present adequate, admissible evidence of damages that would be covered under the Travelers policies." Def. Reply at 1-2 (doc. no. 659). Travelers also does not identify any specific documents that support Claims Database or the Queue as being inadmissible or otherwise faulty.

It is Travelers' position that the summaries, even if admissible, would unfairly prejudice a jury's deliberations. Def. Br. at 2, 5, 12-15 (doc. no. 650-1) (citing Fed. R. Evid. 401, 402, 403). This is so, it is contended, primarily because the summaries evidence "claims well in excess of any possible recovery of damages by GRC" under the excess insurance policies that Travelers sold to GRC. Id. at 2. GRC maintains that the summaries would not unfairly prejudice the factfinder's deliberations. Pl. Resp. at 15-16 (doc. no. 656).

On March 13, 2015, for the first time in this litigation, Travelers presented its objections to GRC's methods of recording and settling the underlying claims. See Def. Statement (doc. no. 640). Travelers contended that additional discovery is needed before trial of GRC's damages. Id. at 3. This request was denied. Fact discovery closed on June 7, 2010. Orders, Jan. 21, 2010 and Feb. 19, 2008 (doc. nos. 239, 199). Expert discovery closed on April 29, 2011. Order, Mar. 17, 2011 (doc. no. 303). Dispositive motions were due by August 1, 2011. Order, Feb. 19, 2008 (doc. no. 199). Despite previous opportunities to request additional discovery, Travelers did not do so. See generally Hr'g Tr., 9:3-10:6, 31:23-32:11, 33:20-35:9, dated Mar. 24, 2015 (doc. no. 644).

4

## I.    FACTS THAT DO NOT PRESENT ANY GENUINE DISPUTES FOR TRIAL

From 1975 through 1985, The Travelers Indemnity Company ("The Travelers") provided GRC with primary liability insurance.[3]  During 1981 through 1994, The Travelers defended and indemnified GRC under those primary policies for asbestos-related bodily injury and property damage claims.  The Travelers had over a decade of claims experience with GRC's liabilities for specific products, how to collect and record information about the claims, what evidence was required to resolve them, and their settlement values.  The Travelers settled thousands of those claims.  Ultimately, GRC's liabilities far exceeded the limits of liability of its primary insurance.  By 1994, the policy limits of GRC's primary insurance with The Travelers were exhausted.

The Travelers no longer defended or indemnified GRC after exhaustion of its primary limits of liability.  On June 10, 2002, GRC tendered the underlying claims to its excess liability insurance carriers.  All of the excess carriers – including Defendant Travelers – denied coverage, maintaining that the policies sold to GRC contain exclusions of such claims.

Left to fend for itself, GRC has negotiated settlements on its own since about 2002, largely using the claims resolution structure initially put in place by The Travelers.  Pl. Br. in Support of

---

[3]  The Travelers Indemnity Company ("The Travelers") sold these primary insurance policies to GRC.  Defendant Travelers Casualty and Surety Company, f/k/a The Aetna Casualty and Surety Company asserts that it had a separate incorporation and history.  Def. Resp. to Pl. Mot. Summ. J. at 9 (doc. no. 652) (citing Pulmonary Advisory Servs. v. Aetna Life & Cas. Co., 58 F. App'x 597, 597 (5th Cir. 2003) (per curiam) ("In 1996, Travelers Property Casualty Corporation . . . acquired Aetna's property and casualty companies . . . .").  It is suggested that Defendant Travelers did not know or could not have learned how GRC's primary insurance carrier, The Travelers, structured GRC's defense – in particular, the methods used for recording and settling claims.  Id.  No further explanation is made as to how that corporate history might have affected Defendant Travelers' response to GRC's tender on June 10, 2002, of the underlying claims along with copies of its Claims Database and the Queue.  In addition, the record establishes that during the period The Travelers was defending the underlying lawsuits using claims databases, GRC fully informed The Aetna, now Defendant Travelers, of that defense strategy.  Accordingly, the assertion that The Travelers and Defendant Travelers are separate corporate entities does not create any genuine disputes for trial.

5

Mot. Summ. J. at 5 (doc. no. 647-1); Pl. Resp. at 2-6 (doc. no. 656). GRC has collected the same categories of evidence and has recorded the same types of information that The Travelers required. GRC has maintained the extensive databases recording the claims asserted against it. GRC remains a defendant in tens of thousands of asbestos-related lawsuits. New cases continue to be filed against GRC, and GRC continues to record and settle new and pending claims.

In essence, GRC has settled with underlying claimants by agreeing to pay a specific dollar amount, which is derived from valuations that claimants with similar types of asbestos-related diseases have recovered. For each settlement, GRC has required the claimant to provide:

> sworn evidence of exposure to a GRC asbestos-containing product at some location
> . . . as well as medical verification of an asbestos-related disease, . . . and that the
> claims are not subject to valid jurisdictional or statute of limitations defenses.

Letter from GRC's counsel to Baron & Budd, confirming settlement, dated Dec. 11, 1998, Conley Aff., Ex. 1, dated Sept. 16, 2011 (doc. no. 364). "But it is not a done deal until we get the release." Deposition Testimony of Jamie P. Yadgaroff, Esq., 20-21, 51:9-15, dated Aug. 11, 2010, Conley Decl. ¶ 12, Ex. I (doc. no. 657-9). See also Yadgaroff Dep., 20:6-51:15, Conley Aff., Ex. 2, dated Sept. 16, 2011 (doc. no. 364) (describing her work).

Since about 2000-2001, each settled claimant has been assigned a right to recover funds that GRC obtained in previous coverage litigation or is successful in recovering in this action. See, e.g., settlement agreement and supporting medical diagnosis, Conley Decl. ¶¶ 17-18, Exs. J, K (doc. nos. 657, 657-10, 657-11). See also Order and Mem., dated Mar. 26, 2012 (doc. nos. 432, 433), and amending Order, dated Mar. 28, 2012 (doc. nos. 434, 434-1); Gen. Refractories Co. v. First State Ins. Co., 862 F. Supp. 2d 382 (E.D. Pa. Mar. 27, 2012) (Ludwig, J.) (ruling that under Pennsylvania law, GRC's "two-tiered or conditional" settlements with the underlying claimants are permissible and

constitute damages within the meaning of the excess insurance policies issued by Defendants in this action – including The Aetna, now Defendant Travelers).

### A. Databases Evidencing the Underlying Lawsuits and Claim Settlements

Beginning in 1981, The Travelers and GRC worked together to resolve the ever increasing number of asbestos-related claims. The Travelers established the structure of GRC's defense, setting the protocol and methods used to analyze, record, and settle those claims. GRC cooperated and together with The Travelers, maintained a computer software database that recorded specific information – such as each plaintiff's name, location of suit, medical diagnosis, details about exposure to specific products, status of the claim, and other information. At times, this was also referred to as the "GENNEW" or the "Access" database. Here, all versions are referred to as the "Claims Database." See Claims Database excerpts, Conley Decl., Ex. E (doc. no. 657-5); Deposition Testimony of Barry L. Katz, Esq., 1277:6-1280:13, dated May 6, 2010, Conley Decl., Ex. F (doc. no. 657-6). See also Conley Aff. ¶¶ 5-6 (doc. no. 646); id., Ex. 5, Katz letter, dated June 10, 2002 (doc. no. 646-5); id., Ex. 6, letter of Travelers' counsel, Stephen B. Nolan, Esq. of Stradley Ronon Stevens & Young, LLP ("Stradley Ronon"), dated July 23, 2008 (doc. no. 646-6).

In addition, GRC has maintained the database that summarizes settlements of the underlying asbestos-related claims, which is referred to as the Queue. In printed form, it is an excel spreadsheet arranging categories of information in vertical columns, and itemizing the details of each claim horizontally per line. According to Travelers, the Queue contains some 31,439 lines of information. Def. Br. at 11 (doc. no. 650-1).

Since about 2000 to 2001, GRC has paid claims on a "first-in-time" basis. See Pl. Resp. at 2 (doc. 656). At that time, Stephanie Stephens, a paralegal for the Sedgwick Law Firm in Dallas,

7

Texas, began documenting and recording settlements on the Queue. Id.; Affidavit of Stephanie M. Stephens ("Stephens Aff.") ¶¶ 1, 3-4, dated May 1, 2015, Conley Decl., Ex. G (doc. no. 657-7). Stephens entered on the Queue the date of receipt of signed releases, and as to each entry:

> Each entry on the Queue was made at or near the time I received the signed release. Each entry on the Queue was based on either information that I reviewed or was based on information that was provided to me by other legal assistants acting on behalf of GRC who indicated they had reviewed and received the releases and had knowledge of the settlements. I maintained the information on the Queue in the regular course of our work on behalf of GRC.

Stephens Aff. ¶¶ 16, 18. The Queue records the priority in which the underlying claims are to be paid. Released claims first entered on the Queue are paid prior to subsequently released claims.

From inception of the Queue until September, 2005, Stephens performed the following as part of her duties for GRC. She reviewed submissions by counsel for underlying claimants that memorialized or supported a settlement with GRC, and she entered certain types of information on the Queue. Stephens Aff. ¶ 5. As part of this review, she confirmed:

- receipt of a medical report that reflected the diagnosis of an asbestos-related disease (id. ¶¶ 6, 7);

- that the plaintiff's diagnosed disease was consistent with the settlement demand (id. ¶ 7);

- that an asbestos-containing product assembled and sold by GRC was identified (id. ¶ 6); and

- that "the plaintiff alleged exposure to a GRC product, and that the alleged exposure time period was consistent with the general time GRC sold the specific product(s)" (id. ¶¶ 8, 10 (citing a list of GRC's former asbestos-containing products that she used in her review, Ex. 1(doc. no. 657-7 at 7)).

Stephens would reject a claimant's submission if the settlement packet:

> did not allege exposure to a GRC asbestos-containing product; . . . alleged exposure outside of the time GRC sold the specific product; or . . . alleged exposure at a location GRC did not believe purchased a GRC product . . . .

Stephens Aff. ¶ 9; see, e.g., Stephens' letters rejecting individual settlements, id. ¶ 11, Exs. 1, 2 (doc. nos. 657-7 at 9-20, 21-33). She "does not recall ever processing a settlement where the underlying plaintiff alleged exposure to raw asbestos sold by GRC." Id. ¶ 10. "Settlements were approved based only on the GRC products referenced in Exhibit 1." Id. (citing the list of GRC's former asbestos containing products, Ex. 1 (doc. no. 657-7 at 7)).

About September, 2005, Stephens transferred to others some of her duties to review settlement materials and enter information on the Queue. Stephens Aff. ¶ 17. She continued to work on settlements, approving and rejecting claims, and continued to update the Queue upon receipt of signed releases. Id. Presently, she reviews and processes settlement submissions in Texas, which is the jurisdiction with the most claims on the Queue. Id.

Stephens reviewed a printout of the Queue, dated April, 2015, a copy of which GRC produced to Travelers. Stephens Aff. ¶ 19. She recognizes it as "the Queue I maintained for GRC through 2005," except for four new columns of information that GRC recently added: "date of first exposure, disease code, running sum and paid." Id. See, e.g., excerpts from the Queue produced to Travelers in April, 2015, Conley Decl. ¶¶ 14-15, Ex. H (doc. nos. 657, 657-8).

## B. GRC Made the Claim Database and the Queue Available to Travelers Along With the Documents That Support Those Summaries

In 1989, while GRC's primary carrier, The Travelers, was defending the underlying claims, GRC's Secretary and General Counsel, Dorothy Stassun Costello, wrote to GRC's excess carrier, The Aetna, now Defendant Travelers. See Costello letter, dated July 18, 1989, Conley Aff. ¶ 10, Ex. 2 (doc. no. 646-2). This letter apprised The Aetna of about 6,000 asbestos-related bodily injury claims that The Travelers was defending under its primary policies. Id. In part, the letter stated:

We believe that pursuant to the terms of the [excess] policies of insurance issued by you to GRX [GRC],[4] coverage is available to GRC for the foregoing claims, and for such similar claims as may be brought against GRC in the future. If your company's position is to the contrary, or if your company does not intend to follow the coverage of underlying insurers, we expect to hear from you in writing as soon as possible so we may avoid any unnecessary misunderstanding or disagreement in the future.

Id. The letter concluded: "To the extent you have any questions or matters of inquiry, or if you desire further information with respect to the referenced claims, please let me know." Id. No requests for more information followed.

Ed Marek, "Product Specialist Environmental/National Accounts Claim" on behalf of The Aetna, now Defendant Travelers, responded. Marek letter, dated Aug. 8, 1989, Conley Aff. ¶ 11, Ex. 3 (doc. no. 646-3) ("reservation of rights letter"). The Aetna acknowledged GRC's July 18, 1989 notice of claims, but asserted that the policies' "Asbestos Exclusion" barred any insurance benefits. This was the sole ground for disclaimer.[5] Id. Furthermore, the letter informed GRC:

By accepting notice of these claims or suits, Aetna is not waiving any other provisions of the insurance contract and all rights are reserved.

At this point, Aetna will do nothing further with these cases and we are asking you to inform us when the underlying limits for the 1985-86 year for non-asbestos claims are near exhaustion.

---

[4] "GRX" referred collectively to GRC and other affiliated business entities. In this Memorandum, "GRC" is substituted for "GRX."

[5] Specifically, The Aetna's reservation of rights disclaimed as follows: "Both of these policies carry . . . Exclusion No. XN-13180, which is the Asbestos Exclusion. The Asbestos Exclusion excludes all loss arising out of asbestos and includes bodily injury and property damage. It further states than any asbestos losses that are covered by any underlying insurance will not be deemed to be covered by such underlying insurance in determining whether any underlying aggregate limit of liability has been exhausted. Any payments made for asbestos losses shall be considered a self-insured retention which the Named Insured must pay before our two policies respond." Marek letter, dated Aug. 8, 1989, Conley Aff. ¶ 11, Ex. 3 (doc. no. 646-3). All of these cited defenses to coverage for the underlying claims depend on application of the Asbestos Exclusion, which was ruled to be ambiguous and unenforceable. Gen. Refractories Co. v. First State Ins. Co., No. 04-3509, --- F. Supp. 3d ----, 2015 WL 918797 (E.D. Pa. Mar. 3, 2015) (Restrepo, J.).

10

Id. Nothing was said about the methods The Travelers and GRC were using to record and settle the underlying claims. No requests were made for more information.

In 1991, while GRC's primary carrier, The Travelers, was defending the underlying claims, GRC's Senior Vice President and General Counsel, Barry L. Katz, wrote to GRC's excess carrier, The Aetna, now Defendant Travelers. See Katz letter, dated Oct. 10, 1991, Conley Aff. ¶ 12, Ex. 4 (doc. no. 646-4). This letter again apprised The Aetna of the asbestos-related bodily injury claims – then numbering about 16,700 pending claims that were being indemnified under the primary policies. Id. The letter referred The Aetna to certain named representatives at The Aetna's offices located across the nation – that is, on the East Coast and in Baltimore, the South and Southwest, Houston, the Mid-West and Hawaii, and Denver – should "further, more detailed information" be needed. Id. Importantly, the letter stated in part:

> GRC has a computer generated listing of all of these cases with detailed information as to disease category and worksites. This computer listing is quite voluminous; should you desire to review this listing, it is available for inspection at General Refractories' corporate offices upon request. GRC will also reproduce this listing for you at a cost of approximately $200.00.

Id. Again, the letter concluded with an offer to provide more information, stating: "To the extent that you have any questions or matters of inquiry, please let me know." Id. The Aetna did not request more information or an appointment to inspect the computer listing.

In 1995, GRC provided to all of its excess liability insurance carriers an additional update as to the status of the asbestos-related claims – then totaling "23,420 open cases." Memo from Michael Conley, Esq., dated May 8, 1995, Conley Aff. ¶ 15, Ex. 7 (doc. no. 646-7). The memo informed the excess carriers – and in particular, The Aetna, now Defendant Travelers – as follows:

11

As you have all been informed, effective November 1, 1994, The Travelers exhausted its primary insurance coverage. Since that date, GRC has been coordinating its defense, largely using the defense structure put in place by [T]he Travelers.

Id. The memo concluded: "If you require any additional information, please contact me." Id. The

Aetna, now Defendant Travelers did not object to the structure of GRC's defense.

On June 10, 2002, GRC tendered the underlying asbestos-related claims to Defendant

Travelers, "including Aetna," as GRC's excess insurance carriers. Katz letter, dated June 10, 2002,

Conley Aff. ¶ 13, Ex. 5 (doc. no. 646-5). Importantly, GRC explained that it enclosed:

a CD that contains a database of GRC's open claims. You should consider this letter a tender of these cases. I am also enclosing a description of each field entry to the database . . . . The database utilizes Access software.

Id. This letter was addressed to Travelers' counsel, Samuel J. Arena, Jr., Esq. of Stradley Ronon,

which law firm continues to represent Defendant Travelers in this action. Id. Once again, Katz on

behalf of GRC concluded with an offer to provide more information: "If you require any other

reasonable information, please let me know." Id.

Before discovery in this action closed on June 7, 2010, Travelers' counsel, Stradley Ronon,

made copies of the Claims Database and the Queue as maintained by GRC through April and May,

2008. See Stradley Ronon's letter, dated July 23, 2008, Conley Aff. ¶ 14, Ex. 6 (doc. no. 646-6).

In addition, Defendants questioned GRC's Rule 30(b)(6) corporate designee, Katz, about both the

Queue and the Claims Database, using printed portions of each marked as deposition exhibits. For

the Queue produced in April, 2010, see Katz Dep., 1051:4-24, 1053:9-1054:24, and for the Claims

Database produced in April, 2008, see Katz Dep., 1277:6-1280:13, 1280:20-1281:21, Conley Decl.

¶ 8, Exs. E, F (doc. nos. 657-5 and 657-6).

During April, 2010, on behalf of GRC, Ms. Stephens gathered documents supporting settlements of the underlying asbestos-related claims for inspection by counsel for Defendants in this action. Stephens Aff. ¶¶ 12-15, Conley Decl. ¶ 10, Ex. G (doc. no. 657-7). As part of that effort, she "pulled from storage a sampling of documents for various years in which settlements occurred and made available additional documents," which were maintained in the Dallas, Texas office. Id. ¶ 13. Stephens affirms that on April 6 and 7, 2010, counsel for Defendants "reviewed approximately 20 boxes of documents in our office in Dallas," and following that review, she "coordinated the scanning of the documents for the defendants." Id. ¶ 14. "GRC made scanned copies of all documents requested and produced in excess of 50,000 pages of documents from files in Texas." Pl. Resp. at 5 (doc. no. 656) (citing Stephens Aff. ¶ 15); Conley Aff. ¶ 9 (doc. no. 646).

In addition, GRC made available for Defendants' inspection and copying the files that GRC has maintained in Pottstown, Pennsylvania. Conley Aff. ¶ 9 (doc. no. 646). "Counsel for defendants reviewed these files on multiple occasions, identified documents for copying, and GRC produced to the defendants approximately 4000 pages of documents." Id. Letter of GRC's counsel, Mark Gottlieb, dated Apr. 30, 2010, addressed to all defense counsel in this action, describing how, when, and where claims information and documents underlying the Queue were available for inspection in 2008 and going forward. Id. ¶ 16, Ex. 8 (doc. no. 646-8).

In March and April, 2015, GRC produced to Defendant Travelers versions of the Queue updated through April, 2015. Pl. Resp. at 6 (doc. no. 656) (citing Conley Decl. ¶ 13, Ex. H (doc. nos. 657, 657-8)). These were delivered in Excel format so that the data could be searched and sorted. Id. In addition, as to those claims listed on the Queue as having been paid, GRC's counsel produced evidence of their payment. Id.

13

As produced in April, 2015, the Queue contained four additional columns: date of first exposure, disease code, running sum, and payment. See, e.g., excerpts from the Queue produced in April, 2015, Conley Decl. ¶¶ 14-15, Ex. H (doc. nos. 657, 657-8). The "running sum" column reflects the total sum of agreed settlement amounts, and the "paid" column reflects claims that were paid by GRC in "the last year or so." Pl. Resp. at 6 (doc. no. 656). The new columns of information were achieved by merging data taken from earlier iterations of the Claims Database and the Queue. Id. (citing Conley Decl. ¶ 14 (doc. no. 657)). GRC also removed from the Queue those claims that GRC had previously paid, but does not sue in this litigation to recover payment. Id. (citing Conley Decl. ¶ 15). In addition, since November, 2010, GRC added about 324 new claims to Queue. Id. (citing Conley Decl. ¶ 15).

Neither Defendant Travelers nor The Aetna ever asked GRC to provide additional information about the methods GRC used to record and settle claims. Neither asked GRC to use different methods than those instituted by The Travelers and maintained by GRC to date.

## II.  DISCUSSION

Under the Federal Rules of Evidence, a summary trial exhibit that meets the requirements of Rule 1006 is admissible as substantive evidence of the content of voluminous writings.[6] It is an evidentiary substitute for the voluminous documents themselves. See United States v. Bansal, 663 F.3d 634, 666-67 (3d Cir. 2011) (admitting summary of business records subject to authentication by records custodians); Gomez v. Great Lakes Steel Div., Nat'l Steel Corp., 803 F.2d 250, 257 (6th

---

[6] Federal Rule of Evidence 1006 provides: "The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court."

Cir. 1986) (such summaries are admitted as evidence). See 6 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 1006.04[1] (Joseph M. McLaughlin, ed., 2d ed. 2015) ("summary itself is the evidence to be considered by the jury").

In United States v. White, 737 F.3d 1121, 1135 (7th Cir. 2013), cert. denied, 134 S. Ct. 2717 (U.S. 2014), the Seventh Circuit affirmed the admission of a summary spreadsheet comparable to the those at issue here. White explains that there are two main ways that a party can summarize complex, voluminous documents at trial, the first of which is germane here:

> First, the party can introduce the information in a summary exhibit under Federal Rule of Evidence 1006, in order "to prove the content of voluminous writings . . . that cannot be conveniently examined in court." If admitted this way, the summary itself is substantive evidence – in part because the party is not obligated to introduce the underlying document themselves. . . . Because a Rule 1006 exhibit is supposed to substitute for the voluminous documents themselves, however, the exhibit must accurately summarize those document. It must not misrepresent their contents or make arguments about the inferences the jury should draw from them.

737 F.3d at 1135 (citing United States v. Milkiewicz, 470 F.3d 390, 395-98 (1st Cir. 2006) (explaining both methods of summarizing); United States v. Janati, 374 F.3d 263, 272-73 (4th Cir. 2004) (Rule does not require that the underlying documents actually be introduced into evidence).

"Courts have cautioned that Rule 1006 is 'not a back-door vehicle for the introduction of evidence which is otherwise inadmissible," and that the voluminous evidence that is the subject of the summary must be independently admissible." Eichorn v. AT&T Corp., 484 F.3d 644, 650 (3d Cir. 2007) (citing United States v. Pelullo, 964 F.2d 193, 204-06 (3d Cir. 1992)). In addition, a summary of evidence must be an accurate compilation of the voluminous records sought to be summarized. 31 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 8043 at 525, §§ 8042, 8044 (1st ed. 2000 & Supp. Apr. 2015).

## A. GRC's Summary Evidence of Business Records Is Admissible, Subject to Proper Authentication by Records Custodians and Objections at Trial

Rule 1006 permits the use of a summary of voluminous records that are otherwise admissible. Bansal, 663 F.3d at 667; State Office Sys., Inc. v. Olivetti Corp. of Am., 762 F.2d 843, 845-46 (10th Cir. 1985) (admitting summary of voluminous business records proving actual loss and damages). Furthermore, Rule 803(6) of the Federal Rules of Evidence creates a hearsay exception for business records.[7] Bansal, 663 F.3d at 667.

GRC proffers the Claims Database and the Queue as summaries of voluminous business records admissible under Rule 803(6). The record supports GRC's position. In its Motion and supporting Brief, Travelers does not present any objection on this ground. In its Reply Brief, however, Travelers presents the question of whether the documents supporting the summaries constitute business records, but does not object to any specific documents. Def. Reply at 5-6 (doc. no. 659). Instead, Travelers suggests that the documents *en masse* are inadmissible because they were prepared in anticipation of litigation. No evidence is proffered that supports that conclusion. It is a characterization of the record that does not create a genuine dispute. On this record, it is ruled that the Claims Database and the Queue summarize business records admissible under Rule 803(6), subject to their proper authentication by a records custodian or another qualified witness and subject to proper, specific objections by Travelers at trial.

---

[7] "A record of an act, event, condition, opinion, or diagnosis" qualifies as an exception to the hearsay rule under Rule 803(6) if: "(A) the record was made at or near the time by – or from information transmitted by – someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6).

16

**B.    GRC Made Its Summary Evidence Available for Inspection and Copying by Travelers at Reasonable Times and Places**

Travelers' principal objection to admission of the Claims Database and the Queue is grounded on Rule 1006's mandate that "the proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006. Travelers' motion asserts that GRC has not yet produced the actual, final, and complete summaries that will be used at trial. The motion also asserts that GRC has refused Travelers' request to review the documents supporting the Queue. These assertions are not supported by evidence. In fact, the record establishes just the opposite – that is, Travelers received copies of the Claims Database and the Queue on multiple occasions over many years, and certainly no later than June 10, 2002, when GRC tendered to Travelers the underlying asbestos-related claims. Travelers has been provided with timely updates as well. That the databases are updated from time to time, as GRC receives new information, does not compromise the timeliness of GRC's production of the summaries or their evidentiary value.

Moreover, Travelers acknowledges receipt of updated iterations of the Queue that GRC produced in discovery and on multiple occasions thereafter – in November, 2010, and in February, March, and April, 2015. See Def. Br. at 6 & n.3, 11-12 (doc. no. 650-1). Travelers admits, "We've got a queue," and describes its review of the supporting documentation. Hr'g Tr., 20:5-6, 21:14, 32:8-11, dated Mar. 24, 2015 (doc. no. 644); see generally id., 7:7-8:25, 23:12-25:2, 32:8-11, 33:15- ⌐ 35:9, 37:19-24, 38:16-40:3. On this record, there is no genuine dispute that within the letter and the spirit of Rule 1006, GRC has made the Claims Database, the Queue, and their supporting documents available for examination and copying by Travelers at reasonable times and places.

17

The assertion that GRC has not yet produced the final and complete Queue that may be used at trial is without merit for another reason. In <u>Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.</u>, 412 F.3d 745, 753 (7th Cir. 2005), Judge Posner ruled that the plaintiff was entitled to present to the defendants, 30 days before trial, summaries of hundreds of thousands of pages of contracts, which plaintiffs believed demonstrated how the defendant reinsurer had been enriched by fraud. As to timeliness of the summaries, Judge Posner explains:

> Rule 1006 requires only that the summarized documents be made available to the opposing party at a "reasonable time"; it does not say when the summaries must be made available to the party – for that matter, it nowhere states that the *summaries* must be made available to the opposing party.

<u>Id.</u>, 412 F.3d at 753 (quoting Fed. R. Evid. 1006). Even though the Queue is a document that changes over time in response to GRC's receipt of signed releases from the underlying claimants, GRC has timely produced updated iterations of the Queue sufficient for a fair trial.

The rulings here are also supported by <u>State Farm Mut. Auto. Ins. Co. v. Lincow</u>, 715 F. Supp. 2d 617 (E.D. Pa. 2010) (Robreno, J.) (ruling on post-trial motions for relief), <u>aff'd</u>, 444 F. App'x 617 (3d Cir. 2011). In that case, the plaintiff insurance companies alleged that the defendant healthcare providers were members of a conspiracy that sharply inflated costs of medical care for car accident victims. At trial, the plaintiffs' proof of defendants' fraud consisted in part of State Farm's claim files and an exhibit summarizing voluminous claim payments made by defendants. More than two years before trial, plaintiffs disclosed these documents to defendants, and the documents were available to defendants for review. Plaintiffs argued that defense counsel failed to review the claim files which had been made available for several years and unreasonably requested production of these files during trial. Judge Robreno ruled that it was sufficient that the supporting

documents were made available at least two years before trial, and "[t]his degree of availability certainly meets the requirements of a reasonable time and place." Id., 715 F. Supp. 2d at 636-37 (citing United States v. Jamieson, 427 F.3d 394, 410-11 (6th Cir. 2005) (notice of the last of the record summaries, over one month before trial began, was timely); Fidelity Nat'l Title Ins. Co. of N.Y., 412 F.3d at 753 (production 30 days before trial was a "reasonable time" when the defendant's law firm could have "easily spot checked the summaries for accuracy" but failed to do so)).

## C. The Deficiencies and Dangers of Prejudice Cited by Travelers Do Not Exist

Travelers objects that GRC's summary evidence is inadmissible because it is inaccurate and presents dangers of unfairly prejudicing the jury. Relevant evidence may be excluded only if

> its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Fed. R. Evid. 403. Rule 403 "does not offer protection against evidence that is merely prejudicial, in the sense of being detrimental to a party's case." Carter v. Hewitt, 617 F.2d 961, 972 (3d Cir. 1980). It "only protects against evidence that is unfairly prejudicial," where the evidence has "an undue tendency to suggest decision on an improper basis." Id., 617 F.2d at 972. GRC's summary evidence, while detrimental to Travelers' case, does not present any dangers of unfair prejudice. In short, Travelers has not shown that admission of the Claims Database and the Queue would create an "undue tendency to suggest a decision on an improper basis." Id.

Travelers faults the Queue for lacking "critical information" about the date on which each of the underlying claimants was first exposed to GRC's products. Def. Br. at 9-10 (doc. no. 650-1). Travelers objects that "more than sixty percent (60%) of the claims" do not identify a date of first exposure." Id. at 10; Def. Reply at 3-4 ("missing exposure information on more than 20,000

claims") (doc. no. 659). Travelers would require GRC to show – as to each claim listed on the Queue – that the claimant was exposed to an asbestos-containing product manufactured or sold by GRC, and that the claimant's first exposure to that product occurred during the policies' effective period, August 1, 1985-86. Def. Br. at 3, 9-10 (doc. no. 650-1); Def. Reply at 4 n.2 (doc. no. 659); Def. Reply at 1-2, 4-5 (doc. no. 660). In addition, Travelers objects that "4,341 of the claims" are not labeled with a disease code denoting the claimant's specific type of asbestos-related disease. Def. Br. at 10 (doc. no. 650-1). The codes, it is contended, are "highly relevant" as to whether a settlement listed on the Queue is reasonable as compared to the claimant's diagnosed disease. Id.

Travelers' position is that the cited shortcomings make the Queue so inaccurate that it is inadmissible: "Without this most basic information regarding exposure, the Queue is inadequate to support GRC's claim for coverage under the Travelers policies and its admission should therefore be precluded." Def. Reply at 4 (doc. no. 659). This is incorrect. As to the disease codes, the record shows that Claims Database contains information about each claimant's diagnosis. In addition, GRC added disease codes on the April, 2015, iteration of the Queue. See Pl. Resp. at 10 (Travelers has "disease codes for over 25,000 of the claims."). Travelers had a fair opportunity to fully discover details about the settlements. As to Travelers' demand for proof that each of the claimants was first exposed to asbestos during the policies' effective period, at best the objections go only to the weight of the evidence. Importantly, the objections are also not sound as a matter of law – there is no such requirement under controlling Third Circuit and Pennsylvania law, as follows.

"In Pennsylvania, the insured bears the burden of proving facts that bring its claim within the policy's affirmative grant of coverage." Koppers Co., Inc. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1446 (3d Cir. 1996) (citing Riehl v. Travelers Ins. Co., 772 F.2d 19, 23 (3d Cir. 1985)). On the other

hand, "the insurer bears the burden of proving the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the basis of an exclusion is an affirmative defense." Id., 98 F.3d at 1446. Both sides agree that it falls upon GRC to initially show a right to insurance benefits; however, they disagree about what that showing entails.

Here, the policies' insuring agreement provides that Travelers will indemnify GRC "against EXCESS NET LOSS arising out of an accident or occurrence during the policy period, subject to the limits of liability . . . and to all of the terms of this policy." Indemnity Agreement, Def. Exs. 1, 2 (doc. nos. 650-3, 650-4). This agreement is defined more specifically, as follows:

> EXCESS NET LOSS means that part of the total of all sums which the INSURED becomes legally obligated to pay or has paid, as damages on account of any one accident or occurrence, and which would be covered by the terms of the Controlling Underlying Insurance, if written without any limits of liability, less realized recoveries and salvages, which is in excess of any self-insured retention and the total of the applicable limits of liability of all policies described in Section 3. Schedule of Underlying Insurance; whether or not such policies are in force.

Id. The terms, "accident" and "occurrence," are not otherwise defined in Travelers' policies.

Travelers interprets this policy language. Def. Br. at 9-10 (doc. no. 650-1); Def. Reply at 4 & n.2 (doc. no. 659); Def. Reply at 2-4 (doc. no. 660). Its analysis begins by isolating from the whole insuring agreement one phrase in the first sentence – that is, "arising out of an accident or occurrence during the policy period." Parsing that phrase, it is noted that the word, "occurrence," is immediately followed by the phrase, "during the policy period." This sequence means that an insured "accident or occurrence" must take place during the policy period. So far, no one disputes these propositions. Both sides also agree that asbestos-related bodily injury claims constitute an occurrence. Pl. Br. at 1 n.1 (doc. no. 647-1). However, Travelers finds that the sequence gives the word, "occurrence," a special meaning – that is, a reasonable policyholder in GRC's situation would

21

understand "occurrence" to equate to a claimant's first "'exposure to, or inhalation of asbestos,'" during the policy period. Def. Reply at 3 (doc. no. 660) (quoting A.W. Chesterton Co. v Mass. Insurers Insolvency Fund, 838 N. E.2d 1237, 1250-53 (Mass. 2005)). Travelers concludes that its liability is not triggered by a claimant's exposure either before or after the policy period.

Travelers' analysis does not consider the definition of Excess Net Loss, which specifically provides insurance for "damages on account of any one accident or occurrence." Indemnity Agreement, supra. Travelers also impermissibly reads into the insuring agreement content that is not to be found in its plain language. Furthermore, Chesterton – the only cited authority for Travelers' position – is not persuasive. That case involves materially different policy language and another jurisdiction's peculiar rules for determining the liability of insurance carriers in the context of asbestos-related claims. Importantly, Chesterton as well as Travelers' understanding of its insuring agreement are fundamentally at odds with controlling Third Circuit and Pennsylvania law.

In J. H. France Refractories Co. v. Allstate Ins. Co., 626 A.2d 502 (Pa. 1993), Pennsylvania's Supreme Court applied a "multiple-trigger" rule for determining liability of insurers to defend and indemnify against asbestos-related bodily injury claims. The "multiple-trigger" rule holds that all phases of asbestos-related disease – exposure, progression, and manifestation – independently constitute an occurrence of indivisible "bodily injury" that triggers insurance coverage:

> The medical evidence in this case unequivocally establishes that injuries occur during the development of asbestosis immediately upon exposure, and that the injuries continue to occur even after exposure ends during the progression of the disease right up until the time that increasing incapacitation results in manifestation as a recognizable disease. If any of these phases of the pathogenesis occurs during the policy period, the insurer is obligated to indemnify J. H. France under the terms of the policy.
> \* \* \*
> Rather than selecting one or another of the phases as the exclusive trigger of liability, it seems more accurate to regard all stages of the disease process as bodily injury sufficient to

trigger the insurers' obligation to indemnify, as all phases independently meet the policy definition of bodily injury.

Id., 626 A.2d at 507, 506-08. See Pennsylvania Nat'l Mut. Cas. Ins. Co. v. St. John, 106 A.3d 1, 18, 20, 22-23 (Pa. 2014) (reaffirming the multiple trigger rule adopted in J. H. France in the context of asbestos-related bodily injury claims). Travelers' position contradicts J. H. France's rule that an insurer's liability is triggered by any phase of an asbestos-related disease during the policy period. Proof that each claimant was first exposed to asbestos during the policy period is not required.

Travelers contends that the "multiple-trigger" rule does not apply here. This is so, Travelers asserts, because its policies contain different insuring language from that at issue in J. H. France. Def. Br. at 3 (doc. no. 650-1). Travelers distinguishes the J. H France policies, which were triggered by "bodily injury" during the policy period, from the policies here, which are triggered by "an accident or occurrence during the policy period." Id. Yet the cited difference is curious, because Travelers acknowledges that "bodily injury" is an "occurrence." In fact, Travelers' insuring agreement is comparable to the agreements presented in J. H. France, which all provided:

[The Insurer] will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury . . . to which this insurance applies, caused by an occurrence . . . .

626 A.2d at 505. In comparison, Travelers agreed to indemnify GRC for:

that part of the total of all sums which [GRC] becomes legally obligated to pay or has paid, as damages on account of any one accident or occurrence . . . in excess of . . . Underlying Insurance . . . .

Indemnity Agreement, supra. A meaningful distinction has not been shown.

Applying Pennsylvania law and the "multiple-trigger" rule of J. H. France, our Court of Appeals in Koppers found that all damages resulting from a single, continuous and indivisible,

23

environmental damage loss was one "occurrence." 98 F.3d at 1451-52. Two of the policies at issue specifically applied to "each occurrence happening during the Policy Period," and the other ten policies applied to "occurrences which happen during the currency hereof." 98 F.3d at 1451 & n.11. Koppers did not find that the sequence of the terms – "occurrence," immediately followed by the phrase, "during the policy period" – created any special meaning, as proposed here by Travelers.

Like the policies in Koppers and J. H. France, Travelers' policies provide occurrence-based coverage for damages "arising out of an accident or occurrence" and "on account of any one accident or occurrence." Indemnity Agreement, supra. Under the "multiple-trigger" rule of J. H. France, and the "continuous trigger" rule applied by Koppers, Travelers' policies – once triggered by GRC's liability for damages arising from a claimant's asbestos-related disease – indemnify GRC for all net loss and damage resulting from that indivisible bodily injury:

Being defined as one "occurrence," the entire injury, and all damages resulting therefrom, fall within the indemnification obligation of the insurer. In other words, once the liability of a given insurer is triggered, it is irrelevant that additional exposure or injury occurred at times other than when the insurer was on the risk. The insurer in question must bear potential liability for the entire claim.

J. H. France, 626 A.2d at 508. In short, Koppers and J. H. France are fully applicable to this case. Under this controlling authority, the cited deficiencies and the asserted missing information do not affect admissibility of the Claims Database or the Queue.

Travelers' motion further objects that the Queue is inadmissible because it contains "excessive, cumulative information" that would unfairly prejudice Travelers at trial. Def. Br. at 12, 12-15 (doc. no. 650-1) (citing Fed. R. Evid. 402, 402, 403). It is asserted that the Queue contains information "well beyond the claims that are potentially subject to payment by Travelers," and "[i]rrelevant evidence is not admissible." Def. Br. at 13-14 (doc. no. 650-1) (citing Fed. R. Evid.

401, 402). These objections are also not sound as a matter of fact and law, and at best go only to the weight of the summary evidence, not its admissibility.

Specifically, Travelers asks that GRC's proof be restricted to only those underlying claims where the claimant's first exposure to an asbestos-containing product, which was manufactured or sold by GRC, occurred during the policies' effective period, August 1, 1985-86. Once again, Travelers' position is based on a misunderstanding – or a rejection – of J. H. France and Koppers. GRC's proof may extend to any claim involving any phase of the pathogenesis of a claimant's indivisible asbestos-related disease that arose during the effective period of Travelers' policies. See J. H. France, 626 A.2d at 507, 506-08. This is what GRC's summary evidence is proffered to do. Moreover, in order to evidence its right to insurance benefits, GRC is not required to provide information on the Queue about the date each of the claimants was first exposed to GRC's products. Instead, GRC may present its damages as it chooses within the requirements of the Federal Rules of Evidence, and Koppers and J. H. France.

Travelers maintains that the Queue is inaccurate and excessive because it contains claims that arose after termination of the effective period of Travelers' policies. GRC acknowledges that its evidence includes a *de minimus* percentage of claims arising from a claimant's first exposure to asbestos after Travelers was no longer on the risk – that is, after the policies terminated on August 1, 1986. Pl. Resp. at 14 (doc. no. 656). GRC agrees that it would not be able to recover damages under the policies for those claims: "the underlying claimants must have been exposed to GRC's products prior to the end of the Travelers policy period." Pl. Resp. at 3 (doc. no. 655). GRC has exposure information for about 11,196 of the claims listed on the Queue (which total about 31,440 to 34,440 claims). Nonetheless, GRC asserts that "[o]nly 10 of the 11,196 claims, or .0009%, have

25

a date of first exposure after August 1, 1986, with 99.6% of the claims having a date of first exposure of 1980 or prior." Pl. Br. at 9 (doc. no. 647-1). GRC maintains that the Claims Database and the Queue together evidence insured damages in excess of $120 million – enough by far to fully exhaust the limits of liability of Travelers' policies, despite the *de minimus* number of claims that are not insured. Pl. Resp. at 14 (doc. no. 656). There is "no question," GRC says, that "the vast majority" of the claims on the Queue – "approximately 99.9991%" – arise from exposures that predate termination of Travelers' policies, triggering coverage. Pl. Resp. at 5 (doc. no. 655). Travelers does not controvert these assertions with any evidence. On this record, Travelers' objections do not present a genuine dispute.

In addition, nothing in the record undercuts GRC's contention that "exposure information was tracked by GRC in its Claims Database for decades, first beginning when [The] Travelers was controlling GRC's defense," and the Claims Database "records all of the years of exposure." Pl. Resp. at 14 (doc. no. 656). The record also establishes that on multiple occasions over the years, Travelers received copies of the Claims Database and the Queue. Moreover, Travelers had a fair opportunity in discovery to examine the documents supporting GRC's summary evidence and establish for itself whether the underlying claims trigger Travelers' policies. Yet Travelers does not identify any specific claims that should be removed from GRC's summary evidence.

Travelers would also require GRC to provide better evidence than the Queue that each claimant was exposed to an asbestos-containing product manufactured or sold by GRC – as opposed to raw asbestos or perhaps a product supplied by another company. Once again, no evidence is proffered to support the objection. Since the inception of this action, it has been GRC's position that each underlying claim for which it seeks insurance benefits arises from a claimant's exposure to one

26

of its asbestos-containing products. GRC contends that its methods for recording and settling claims ensured that only those claims based on its asbestos-containing products would be entered on its databases. Pl. Resp. at 6-7 (doc. no. 655). The record does not contain any evidence that GRC agreed to a single settlement of a claim that arose from an alleged sale of raw asbestos or another supplier's products. Travelers' objection does not present a genuine dispute. In any case, the objections on this ground go to the weight of the summary evidence, not its admissibility.

Travelers further asks that GRC's proof be limited to the "amount recoverable under the Travelers policies" – $21 million in combined limits of liability. Def. Br. at 14 (doc. no. 650-1). Both sides agree that for a full recovery under both policies, GRC would have to establish $51 million in damages. Id. at 12-13; Pl. Resp. at 9 (doc. no. 647-1). It is not clear whether Travelers asks that GRC's proof be constrained to claims totaling $21 million or instead, $51 million. In any case, GRC maintains that its summary evidence establishes damages in excess of $120 million.

No matter how the proposed $21 million versus $51 million restriction is computed, this objection cannot be sustained. At trial, GRC is entitled to introduce evidence that has any "tendency to make" GRC's net loss or damage "more or less probable than it would be without the evidence." Fed. R. Evid. 401. That is, GRC may present any claim "arising out of an accident or occurrence during the policy period." Indemnity Agreement, supra (defining net loss in part as "all sums which [GRC] becomes legally obligated to pay or has paid, as damages on account of any one accident or occurence"). J. H. France and Koppers do not permit GRC's proof to be reduced to only those claims that exhaust the limits of liability of Travelers' policies.

As to how liability should be allocated to any one insurance carrier that was on the risk at one time or another during the span of a claimant's disease, J. H. France held that "every insurer which

27

was on the risk at any time during the development of a claimant's asbestos-related disease has an obligation to indemnify" its insured. 626 A.2d at 507. Insurers whose coverage had been triggered were held jointly and severally liable for the full amount of the insured's claim up to policy limits, and the insured was entitled to select the policy or policies under which it would be indemnified. Id. at 508. "Any policy in effect during the period from exposure through manifestation must indemnify the insured until its coverage is exhausted." Id. at 509.

Applying Pennsylvania law and the rule of J. H. France, our Court of Appeals in Koppers held that where the entire injury is defined as one "occurrence," as it is in Travelers' policies here, "a triggered policy must indemnify the insured for all damages resulting from that injury." 98 F.3d at 1451. Applying J. H. France's "allocation approach," Koppers held "jointly and severally liable all policies triggered to cover a single, indivisible loss." Id. Koppers further held that where "multiple insurance policies are triggered to cover an indivisible loss, each insurer may be called upon to cover the entire loss up to policy limits." Id. at 1452. As Koppers explains:

> We must apply this principle of indemnity – barring recoveries greater than losses – in conjunction with the J. H. France rule – holding that where multiple insurance policies are triggered to cover an indivisible loss, each insurer may be called upon to cover the entire loss up to policy limits.
>
>       \*   \*   \*
>
> Under J. H. France, the insured gets indemnified first (pursuant to the insuring agreements) and *then* the insurers may seek to redistribute the burden among themselves. . . .
>
>       \*   \*   \*
>
>     In sum, taking all of the above rules together, we predict that the Pennsylvania Supreme Court would hold that the non-settling excess insurers are jointly and severally liable for the full amount of the loss in excess of: the sum of (1) the policy limits of the directly underlying, "exhausted" . . . policies; and (2) the combined pro rata shares of other settling (primary and excess) insurers.

98 F.3d at 1452, 1454. Accordingly, under Koppers and J. H. France, GRC may prove any and all

claims that trigger the policies on the risk for 1985-86, to establish GRC's entire loss. The Queue is admissible for that purpose – establishing a total damages figure.

Travelers contends that GRC has a burden to identify – or in Travelers' words, "allocate" – each of the underlying asbestos-related claims for which GRC seeks insurance from Travelers, and then serially prove, claim-by-claim, that each one meets Travelers' proposed requirements. Def. Reply at 5-6 (doc. no. 660). For example, it is contended that "GRC must allocate claims to the 1985-86 policy period so that any trial can be managed more easily and only relevant evidence involving claims that may be actually subject to payment under the Travelers policies will be presented to the jury." Def. Br. at 14 (doc. no. 650-1). No authority is provided to support this theory of allocation. Importantly, the theory is contradicted by controlling authority. Rule 1006 permits a summary to substitute as evidence of the contents of underlying claim documents. Importantly, under Koppers and J. H. France, GRC may sue for its total damages from any one defendant insurer on the risk – such as Travelers here. GRC's summary evidence is permissible to do just that – present its total $120 million in damages for which it sues under Travelers' policies.

On this record, it is also ruled that the Claims Database and the Queue are summaries admissible under Rule 1006, subject to proper, specific objections by Travelers at trial. Travelers may then challenge the weight that the jury might give to the summary evidence.

Travelers' motion will be denied, and the objections set forth in Travelers' motion in their entirety are overruled.

An appropriate Order accompanies this Memorandum.